798 A.2d 634 (2002)
351 N.J. Super. 362
In the Matter of FRESHWATER WETLANDS PROTECTION ACT RULES, Statewide General Permit, Cranberry Expansion, Promulgated by New Jersey Department of Environmental Protection.
Superior Court of New Jersey, Appellate Division.
Submitted April 22, 2002.
Decided May 17, 2002.
*636 Rutgers Environmental Law Clinic, attorneys for appellants American Littoral Society, Environmental Defense Fund, National Wildlife Federation, New Jersey Audubon Society, New Jersey Environmental Federation, New Jersey Environmental Lobby, New Jersey Public Interest Research Group Citizen Lobby, Inc., Sierra Club, New Jersey Chapter, New Jersey Conservation Foundation and Pinelands Preservation Alliance (Edward Lloyd of Columbia University School of Law Environmental Law Clinic, Susan Kraham and Ann Alexander, of counsel; Ms. Alexander, on the brief).
David Samson, Attorney General, attorney for respondent Department of Environmental Protection (Patrick DeAlmeida, Deputy Attorney General, of counsel; Barbara L. Conklin, Deputy Attorney General, on the brief).
Before Judges PETRELLA, KESTIN and ALLEY.
*635 The opinion of the court was delivered by PETRELLA, P.J.A.D.
The appellants[1] challenge an administrative regulation, N.J.A.C. 7:7A-5.23, promulgated by the State Department of Environmental Protection (DEP). The regulation authorizes the expansion of certain cranberry growing operations in the Pinelands through the creation of a statewide general permit known as General Permit 23 (GP23 or SGP23). On appeal appellants argue:
I. SGP 23 FAILS TO COMPLY WITH THE STRINGENT IMPACTS MITIGATION REQUIREMENTS OF THE FWPA.
II. SGP 23 IS SUBSTANTIALLY LESS STRINGENT IN NUMEROUS RESPECTS THAN THE FEDERAL PROGRAM:
A. THE ACREAGE IMPACTED UNDER SGP 23 IS FAR GREATER THAN THE ACREAGE IMPACTED UNDER NWP 34.
B. NWP 34 CONTAINS MITIGATION REQUIREMENTS NOT FOUND IN SGP 23.
C. NWP 34 CONTAINS ENDANGERED SPECIES PROTECTION NOT FOUND IN SGP 23.
D. NWP 34 REQUIRES MORE EXACTING CONSIDERATION OF ALTERNATIVE[S] THAN DOES SGP 23.
III. SGP 23 WAS IN VIOLATION OF THE NON-DEGRADATION REQUIREMENTS OF THE SURFACE WATER QUALITY STANDARDS.
IV. NJDEP VIOLATED THE ADMINISTRATIVE PROCEDURE ACT IN PROMULGATING SGP 23 THROUGH CRITICAL MISREPRESENTATION.
*637 New Jersey is reportedly the third largest producer of cranberries in the country, with an approximate yield of 450,000 barrels per year. New Jersey's cranberries are exclusively harvested in the Pinelands.
The Pinelands are classified as Freshwater Wetlands under N.J.S.A. 13:9B-3 and Federal Wetlands under the Clean Water Act (CWA). 33 U.S.C.A. § 344.[2] Under the CWA, as head of the Army Corp of Engineers, the Secretary of the Army (Secretary), in conjunction with the United States Environmental Protection Agency (EPA), administers the program as it pertains to wetlands. Federal permits may be issued by the Secretary "after notice and opportunity for public hearings for the discharge of dredged or fill material" into and around wetlands. Ibid. New Jersey has adopted its own wetlands protection act and permit program known as the Freshwater Protection Act (FWPA) and the DEP has the responsibility for the administration of these permits, in lieu of the federal agencies. See 33 U.S.C.A. § 1342(b). However, the State's decision to issue permits is subject to EPA approval, and the State standards for granting these permits may not be less stringent than the federal standards. 33 U.S.C.A. § 1371.
N.J.S.A. 13:9B-9(a) requires that an entity, other than those under the jurisdiction of the Pinelands Commission (see N.J.S.A. 13:9B-6(b)),[3] seeking to conduct any regulated activity in freshwater wetlands must possess a FWPA permit. "Regulated activity" is broadly defined in the statute as:
(1) The removal, excavation, disturbance or dredging of soil, sand, gravel, or aggregate material of any kind;
(2) The drainage or disturbance of the water level or water table;
(3) The dumping, discharging or filling with any materials;
(4) The driving of pilings;
(5) The placing of obstructions;
(6) The destruction of plant life which would alter the character of a freshwater wetland, including the cutting of trees[.] N.J.S.A. 13:9B-3.
The federal regulations require permits for "the construction of any canal, ditch, dike or other waterway or structure which drains or otherwise significantly modifies a stream, lake, swamp, bog or any other wetland or aquatic area...." 33 C.F.R. 323.4(a)(1)(iii)(c)(2). But certain cranberry farming activities are exempt from these requirements. 33 C.F.R. 323.4. Permits are not required for discharges of dredged or fill material "for the purpose of installing ditching or other such water control facilities incidental to planting, cultivating, protecting, or harvesting of ... cranberries" in wetlands which have already been established for "such agricultural and silvicultural wetland crop production." 33 C.F.R. 323.4(a)(1)(iii)(C)(1)(ii).
Under 33 U.S.C.A. § 1344(e), the federal government has authorized general permits,[4] rather than the usual individual *638 ones, where it considers the environmental effect of the wetland activity de minimus.
In New Jersey, N.J.S.A. 13:9B-23 allows the DEP to issue general permits, and states in pertinent part:
(c) The department shall issue additional general permits on a Statewide or regional basis for the following categories of activities, if the department determines, after conducting an environmental analysis and providing public notice and opportunity for a public hearing, that the activities will cause only minimal adverse environmental impacts when performed separately, will have only minimal cumulative adverse impacts on the environment, will cause only minor impacts on freshwater wetlands, will be in conformance with the purposes of P.L. 1987, c. 156 (C. 13:9B-1 et seq.), and will not violate any provision of the federal act:
* * *
(5) Activities, as determined by the department, which will have no significant adverse environmental impact on freshwater wetlands, provided that the issuance of a general permit for any such activities is consistent with the provisions of the Federal Act and has been approved by the United States Environmental Protection Agency[.] (N.J.S.A. 13:9B-23(c)(5)).
General permits issued by the State are valid for five years, may be subject to conditions, and may be modified or revoked at any time. N.J.S.A. 13:9B-23(d),(e). Such permits allow the regulated entity to engage in any of its enumerated activities without first having to apply for an individual permit for each activity. N.J.S.A. 13:9B-23(g). Instead, the entity is to provide thirty days advance written notice to the DEP, and is supposed to receive an answer therefrom within thirty days.
Prior to the availability of the State's general permit, the Secretary issued Nationwide Permit # 34 (NWP34), for those activities listed in 56 Fed.Reg. 59110, 59144, to allow its holders to engage in "[d]ischarges of dredged or fill material for dikes, berms, pumps, water control structures or leveling of cranberry beds associated with expansion, enhancement, or modification activities at existing cranberry production operations...." The permit holder is not to exceed ten acres of "disturbance per cranberry production operation" measured over the life of the permit, and the activity cannot result in a "net loss of wetland acreage." Ibid. The permit also includes notification requirements and procedures which must be followed by the permittee. However, NWP34 is subject to mitigation requirements and does "not authorize any discharge of dredged or fill material related to other cranberry production activities such as warehouses, processing facilities, or parking areas." Ibid.
A July 21, 1992 "Memorandum to the Field" (RGL 92-02) published in 57 Fed. Reg. 32523, 32524 and issued by federal authorities recognized that cranberry production is a "water dependent activity" because it requires either "wetlands or areas altered to create a wetland environment." Activities classified as "water dependent"[5] relieve permit applicants of the need to rebut the presumptions that: (1) "practicable alternatives that do not involve *639 special aquatic sites are presumed to be available" and (2) "all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem." 40 C.F.R. 230.10(a)(3). However, the permittee must satisfy the requirements in 40 C.F.R. 230.10(a) that the proposed discharge is the "least environmentally damaging practicable alternative, after considering aquatic and non-aquatic alternatives as appropriate." 57 Fed.Reg. 32523, 32524.
40 C.F.R. 230.10(a)(2) provides:
An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.
In its November 1999 letter to the U.S. Fish and Wildlife Service, the EPA stated that both the EPA and the Army Corps of Engineers continue to view the July 21, 1992 memorandum (RGL 92-02) as a valid statement of national policy.
Additionally, the Secretary has expressed the view that the usage of uplands as an alternative to the expansion of bogs in wetlands need not be mandated on the ground that, "[a]lthough it has been demonstrated that cranberries can be cultivated in former uplands (cranberry bogs are wetlands because of the hydrology that must be maintained), this is technically difficult and typically would not be practicable." Comments at 61 Fed.Reg. 65904.
The State general permit that is the subject of this appeal was promulgated by the DEP and approved[6] by the EPA. N.J.A.C. 7:7A-5.23 (formally N.J.A.C. 7:7A-9.23), allows eligible cranberry growers to receive a statewide general permit, known as General Permit 23 (GP23), for their activities in the Pinelands. In order to qualify for a GP23, the applicant must be a "discrete legal entity" that prior to the date of enactment was already in active cranberry production in the Pinelands and "[w]as reported as a cranberry growing operation to the United States Department of Agriculture Cranberry Marketing Committee." N.J.A.C. 7:7A-5.23 (a).
A GP23 permit can be valid for up to five years. N.J.S.A. 13:9B-23(e). However, the regulation gives the Commissioner the discretion "to modify, suspend, or revoke" GP23 permit authorizations at any time. N.J.A.C. 7:7A-5.23(r). The permit authorizes, but is not limited to, "the construction or expansion of a bog, reservoir, canal, ditch, dike, tail water recovery system, water quality improvement system, or other similar support type facility." N.J.A.C. 7:7A-5.23(b). The construction or expansion of sheds and housing, as well as the establishment of new sites for storing or stockpiling materials, is not authorized. Id. Each cranberry growing operation is limited to one authorization under GP23 per year. N.J.A.C. 7:7A-5.23(f).
General Permit 23 authorizes an existing cranberry grower to expand up to ten acres per operation per year, provided that:
1. No more than 10 acres of freshwater wetlands and/or State open waters shall be lost and/or disturbed in any one year;

*640 2. No more than 10 acres of forested freshwater wetlands shall be lost and/or disturbed over the five year term of general permit 23; and
3. No more than four of the 10 acres lost and/or disturbed under (h)2 above shall be Atlantic white-cedar wetlands. N.J.A.C. 7:7A-5.23(h).
In addition, statewide caps limit the growers' activities in the aggregate. The amount of acreage impacted[7] under the State permit over its five year term is limited to a maximum of 300 acres. N.J.A.C. 7:7A-5.23(i). Within that five year cap, GP23 also places a limit of sixty acres per year, with a provision "that if the Department authorizes fewer than 60 acres of loss and/or disturbance in any year, up to 30 acres of unused loss or disturbance may be carried forward to a subsequent year, but in no case shall more than 90 acres of freshwater wetlands and/or State open waters be lost or disturbed in one year[.]" Id. Moreover, of the 300 acres allowed, only a maximum of eighty acres are allowed to be forested wetlands, and of that area of allowable environmental impacts, no more than twenty-five acres can be Atlantic white-cedar wetlands. Id.
N.J.A.C. 7:7A-5.23(d) ranks the various wetlands which are found in the Pinelands region in the order to be considered for use in the expansion of cranberry growing operations, with "State open waters" being the most preferred, as follows:
1. State open waters;
2. Abandoned blueberry fields;
3. Abandoned cranberry bogs;
4. Abandoned agricultural fields;
5. Freshwater wetlands dominated by emergent vegetation;
6. Freshwater wetlands dominated by scrub/shrub vegetation;
7. Forested freshwater wetlands that are not Atlantic white-cedar wetlands; and
8. Atlantic white-cedar wetlands.
To obtain authorization under GP23, the cranberry growers must conduct their activities in the area with the lowest number ranking on the list, so that any project related impacts occur in the wetland types of the lowest value. N.J.A.C. 7:7A-5.23(c). The authorization is not supposed to issue if the proposed activities "will cause a net loss [defined in N.J.A.C. 7:7A-1.4] of freshwater wetlands at a single cranberry growing operation." N.J.A.C. 7:7A-5.23(g).
The Atlantic white-cedar wetlands (AWC) have been deemed by the EPA to be the "most valuable in the Pinelands," and as such are considered to be "high value or unique wetlands." Thus, expansion into these areas is highly discouraged under GP23. See N.J.A.C. 7:7A-5.23(d). Moreover, for proposed expansions into AWC wetlands, applicants must "demonstrate that there is no suitable upland area available, which is owned by the applicant" that could be used "in order to eliminate or minimize impacts to Atlantic white-cedar wetlands." N.J.A.C. 7:7A-5.23(j). Any such proposed expansion into AWC wetlands of over five acres requires "a written statement from the Natural Resources Conservation Service that the activities will minimize, to the extent feasible, the impacts to the remaining Atlantic white-cedar wetlands." N.J.A.C. 7:7A-5.23(k).
Any impact to higher value wetlands, that is wetlands other than "abandoned blueberry, cranberry, or agricultural fields, or State open waters," requires the cranberry grower to compensate the DEP through the transfer of Pinelands Development *641 Credits (PDCs)[8] depending upon the type of wetland impacted. N.J.A.C. 7:7A-5.23(l).
PDCs transferred to the DEP by GP23 applicants are placed in the Pinelands Development Credit Bank and are sold to other private entities seeking to increase their allowable development densities in the wetlands. N.J.A.C. 7:7A-5.23(m), (n). The proceeds of these sales are intended "to establish and/or restore Atlantic white-cedar wetlands in the Pinelands" through the Atlantic white-cedar restoration program. Id.
GP23 in its current form was proposed by the DEP on June 21, 1999. 31 N.J.R. 2964(a). The DEP had previously proposed a similar freshwater wetlands general permit for cranberry growers in the Pinelands. Id. However, this proposal had been rejected by the EPA and expired on September 16, 1997.
This general permit was again proposed on October 19, 1998, with changes included to address the EPA's rejection of the DEP's original proposal. However, the EPA again withheld approval of the State's general permit program based upon its continuing concerns that the proposed general permit could result in more than minimal adverse effects to the environment, particularly due to potential impacts in the "high value or unique" wetlands, especially wetland areas dominated by Atlantic white-cedar.
The EPA provided a list of conditions which had to be met in order for it to approve the proposed general permit. In an April 16, 1999 letter, the EPA delineated the appropriate modifications which had to be taken in order to gain its approval. After the DEP modified the general permit in accordance with those recommendations, the EPA withdrew its objections.
GP23 was approved by the Pinelands Commission on July 20, 1999 and adopted by the DEP on September 13, 1999.[9] On November 8, 1999, the EPA gave its support to the regulation containing GP23 in a letter to the U.S. Fish and Wildlife Service. Appellants filed an appeal on November 18, 1999.
On August 7, 2000, the DEP readopted GP23 and recodified it as N.J.A.C. 7:7A-5.23. 32 N.J.R. 1253(a). On June 29, 2001, the Acting Governor extended the expiration date of N.J.A.C. 7:7A to August 7, 2001. See 33 N.J.R. 2640(b).

I.
The first issue on appeal involves the applicability to GP23 of the mitigation requirements of N.J.S.A. 13:9B-13(a), which provides:
The department shall require as a condition of a freshwater wetlands permit that all appropriate measures have been carried out to mitigate adverse environmental impacts, restore vegetation, habitats, and land and water features, prevent sedimentation and erosion, minimize the area of freshwater wetland disturbance and insure compliance with the Federal Act and implementing regulations.
*642 That provision, if applicable, would arguably require more stringent mitigation requirements than do the federal regulations. The appellants argue that because the DEP issued the permit, the quoted provision automatically applies, and that once the permit is issued the conditions therein apply.
However, N.J.S.A. 13:9B-6(b) exempts the Pinelands from the State's requirements for a freshwater wetlands permit. It reads:
Activities in areas under the jurisdiction of the Pinelands Commission pursuant to P.L. 1979, c. 111 (C. 13:18A-1 et seq.) shall not require a freshwater wetlands permit, or be subject to transition area requirements established in this act, except that the discharge of dredged or fill material shall require a permit issued under the provisions of the Federal Act, or under an individual and general permit program administered by the State under the provisions of the Federal Act and applicable State laws, provided that the Pinelands Commission may provide for more stringent regulation of activities in and around freshwater wetland areas within its jurisdiction. [emphasis added.]
The enactment of this statute preceded New Jersey's assumption of the federal permitting process under 33 U.S.C.A. § 1344;[10] and anticipated the State's assumption of the Federal permitting program. N.J.S.A. 13:9B-6. The CWA provides that states that have assumed control of the federal permitting process may have regulations that are more stringent, but not less stringent, than the federal regulations. 33 U.S.C.A. § 1370.
The statute exempts activities in the Pinelands from any state permitting requirements under the FWPA by stating that such activities: "shall not require a freshwater wetlands permit, or be subject to transition area requirements established in this act." N.J.S.A. 13:9B-6(b). While this statute exempts activities in the Pinelands from freshwater wetlands permit requirements, it still requires all permittees to meet the federal CWA requirements by requiring "a permit issued under the provisions of the Federal Act" or "under the Federal Act and applicable State laws...." Ibid. Thus, such permits are issued only to the extent required by federal law.
The State is responsible for administering both the federal CWA and State FWPA permits. The FWPA permits are more stringent than their federal counterparts. Because the DEP is precluded from issuing state FWPA permits to these entities, these permits were administered under provisions of the Federal act, namely 33 U.S.C.A. § 1344(e), which allows the usage of general permits. Thus, the federal standards govern.
Appellants' suggested construction of this statute would negate some of its language. In their view, any permits issued pursuant to the federal program in the Pinelands would require the State to meet the requirements of the FWPA simply because the State issued a federally required permit. However, this would nullify the statutory exemption to the effect that state permits are only required to the extent that they are required under federal law.
The exemptions are to be given full effect in construing the statute. Thus, the State mitigation requirements in N.J.S.A. 13:9B-13(a) do not apply to GP23. In addition, the EPA has found that the program's *643 mitigation requirements are sufficient to meet federal standards.

II.

A.
Next, the appellants allege that GP23 is invalid because it is impermissibly less stringent than the federal program. They claim that GP23 impermissibly allows a far greater amount of acreage to be impacted than does its federal counterpart, NWP34.
Under NWP34, the permitee may not exceed a cumulative total of ten acres of disturbances over the duration of the permit, whereas GP23 authorizes an existing cranberry grower to expand up to ten acres per year over the entire five year life of the permit (a maximum possible expansion of up to fifty acres per grower). 56 Fed.Reg. 59110, 59144; N.J.A.C. 7:7A-5.23(h). Appellant argues that "[t]his fact alone renders SGP 23 less stringent than the federal program as embodied in NWP 34, by a factor of five."
However, in its November 8, 1999 letter to the U.S. Fish and Wildlife Service, the EPA stated:
EPA believes that the revised GP23 is consistent with and as stringent as the standards of the Federal wetlands program.... On the issue of different acreage restrictions between GP 23 and NWP 34, though there is a different acreage impact allowed under GP 23 (10 acres/grower/year), NWP 34 does not have any overall cap, such as the 300 acre statewide cap contained in the GP. Therefore, theoretically, under NWP 34 there could be more total acreage impact in New Jersey if every grower decided to request authorization for a 10 acre expansion. Based on a review of all these factors, EPA believes that GP 23 is at least as protective of wetlands and other aquatic areas as NWP 34.
Currently, there are forty-seven listed cranberry producers in New Jersey. 31 N.J.R. 1571. Under the federal NWP, each producer would be entitled to expand up to ten acres over the five years of the permit. 56 Fed.Reg. 59110, 59144. What this means is that the maximum acreage that could permissibly be affected under the federal permit would be 470 acres. In contrast, GP23 places a statewide cap of 300 acres of possible expansion over the life of the permit. N.J.A.C. 7:7A-5.23(h). Moreover, unlike the federal permit plan, GP23 requires its permittees to conduct their activities in wetlands of the lowest possible value, and places limits on impacts in higher value wetlands such as forested freshwater wetlands and Atlantic white-cedar wetlands. N.J.A.C. 7:7A-5.23(c); N.J.A.C. 7:7A-5.23(h), (i).
Our review of the record in light of the arguments presented satisfies us that the State's general permit program comports with the requirements of the CWA, and is not less protective than NWP34. Furthermore, deference is accorded to the EPA's interpretation of the permit. See In the Matter of the Distribution of Liquid Assets Upon Dissolution of the Union County Regional High School District No. 1, 168 N.J. 1, 10-11, 773 A.2d 6 (2001); Housley v. Wave Energy Systems, 343 N.J.Super. 574, 582, 779 A.2d 453 (App. Div.2001) (deference is given to an agency's construction of a statute it is assigned to administer). The record supports the finding of the EPA that GP23 does not permit more acreage to be impacted than does NWP34.

B.
The appellants also assert that GP23 is less stringent than NWP34 on the ground that the federal program contains mitigation requirements not found in its New *644 Jersey counterpart. They assert that GP23 does not comport with the mitigation standards in General Condition 19 established after the promulgation of GP23. 65 Fed.Reg. 12818, 12896.
That provision states:
19. Mitigation. The project must be designed and constructed to avoid and minimize adverse effects to waters of the United States to the maximum extent practicable at the project site (i.e., on site). Mitigation will be required when necessary to ensure that the adverse effects to the aquatic environment are minimal. The District Engineer will consider the factors discussed below when determining the acceptability of appropriate and practicable mitigation necessary to offset adverse effects on the aquatic environment that are more than minimal.
(a) Compensatory mitigation at a minimum 1:1 ratio will be required for all wetland impacts requiring a PCN. Consistent with National policy, the District Engineer will establish a preference for restoration of wetlands to meet the minimum compensatory mitigation ratio, with preservation used only in exceptional circumstances. (65 Fed.Reg. 12818, 12896 [emphasis added]).
Because the Pinelands are National Resource waters, activities under NWP34 require preconstruction notification (PCN) pursuant to General Condition 25. 65 Fed.Reg. 12818, 12897. Thus, appellants argue that the requirement of "[c]ompensatory mitigation at a minimum 1:1 ratio" for all wetland impacts must be met by GP23 in order for it to be as stringent as NWP34. GP23 does not possess such a rigorous requirement, as it only requires 1:1 mitigation (see subsection 19(a)) for impacts to Atlantic white-cedar wetlands and losses to other types of wetlands. N.J.A.C. 7:7A-5.23(g),(n)(2). As noted, "impacts" are considered either "losses" or "disturbances." Under GP23, the 1:1 mitigation requirement does not apply to any disturbances occurring in wetlands other than Atlantic white-cedar wetlands. N.J.A.C. 7:7A-5.23(n)(2).
General Condition 19 requires mitigation only "when necessary to ensure that the adverse effects to the aquatic environment are minimal." 65 Fed.Reg. 12818, 12896 (emphasis added). It states that the "District Engineer will consider the factors discussed below" (which includes subsection 19a) in instances where it has been determined that mitigation is necessary to "offset adverse effects on the aquatic environment that are more than minimal." Id.
Thus, the cited subsection is one in a list of mitigation techniques to be considered by the District Engineer after it has been determined that the effects to the environment are more than minimal. It does not apply automatically to the activities in the Pinelands challenged by appellants. Moreover, in granting its approval to GP23, the EPA specifically stated: "we have determined that GP23 will have no more than minimal adverse environmental effects on the aquatic environment."
This interpretation of General Condition 19 is consistent with the agency's interpretation. In light of the foregoing, it cannot be said that NWP34 contains more stringent mitigation requirements than GP23. Furthermore, the EPA's finding that GP23's environmental impacts are minimal renders subsection 19(a) inapplicable because those mitigation requirements would not apply. We give appropriate weight to the EPA's findings in this regard. Housley, supra (343 N.J.Super. at 582, 779 A.2d 453).

C.
The appellants also claim that the protections for endangered species in GP23 *645 fall short of those in NWP34. NWP34's protections for endangered species are found in General Condition 11, which states in pertinent part:
11. Endangered Species. (a) No activity is authorized under any NWP which is likely to jeopardize the continued existence of a threatened or endangered species or a species proposed for such designation, as identified under the Federal Endangered Species Act, or which will destroy or adversely modify the critical habitat of such species. Non-federal permittees shall notify the District Engineer if any listed species or designated critical habitat might be affected or is in the vicinity of the project, or is located in the designated critical habitat and shall not begin work on the activity until notified by the District Engineer that the requirements of the Endangered Species Act have been satisfied and that the activity is authorized.... As a result of formal or informal consultation with the FWS or NMFS, the District Engineer may add species-specific regional endangered species conditions to the NWPs.

[65 Fed.Reg. 12818, 12893.]
The current version of General Condition 11 is substantially similar to the version in effect when GP23 was approved by the EPA. See 56 Fed.Reg. 59110, 59145.
EPA approval of GP23 was conditioned upon the inclusion of various provisions protective of endangered species. The State permit program requires applicants to "[d]esign and carry out the activities to avoid irreversible adverse impacts on the survival of any local populations of threatened or endangered plants of the Pinelands, consistent with the Pinelands Comprehensive Management Plan at N.J.A.C. 7:50-6.27." N.J.A.C. 7:7A-5.23(o)(5) (emphasis added). In addition, N.J.A.C. 7:7A-5.23(v) states:
In order to ensure compliance with the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 et seq., general permit 23 will be added to the list of general permits subject to coordination procedures with the U.S. Fish and Wildlife Service under the Department's Memorandum of Agreement regarding the Endangered Species Act and New Jersey's assumption of the Federal 404 program.
The appellants' contentions that GP23 does not afford the same degree of protection to endangered species as NWP34 are without merit.
Pursuant to N.J.A.C. 7:7A-5.23(v), GP23 applicants are bound by the standards contained in a Memorandum of Agreement entered into between the DEP and the U.S. Fish and Wildlife Service (FWS Agreement), the terms of which bring GP23 in line with the requirements of General Condition 11.
The FWS Agreement protects both endangered plants and animals. Under the FWS Agreement, protection is afforded to threatened and endangered species as well as "species proposed for federal listing." Thus, the range of species protected under the FWS Agreement (and therefore GP23) does not differ from those protected under NWP34 through General Condition 11. Furthermore, as is the case with General Condition 11, an analysis is required to determine potential effects on the protected species and their critical habitats.
Finally, whereas federal applicants are to avoid "irreversible adverse impacts on the survival" of these species, the State applicants must prove that, "the proposed activity is not likely to adversely affect federally-listed species or designated critical habitat." Arguably, this may be an even higher standard. Where this standard has not been met, a permit will either be denied or be made subject to project modifications and/or permit conditions.
*646 We conclude that the FWS Agreement is as stringent as General Condition 11 and that GP23's protections of endangered species are just as stringent as those mandated under NWP34.

D.
Appellants also claim that GP23 is not as stringent as NWP34 because it does not comport with the requirements of RGL 92-02, which requires "consideration of upland alternatives" before the issuance of a permit.
Under RGL 92-02, as published in the Federal Register, before a permit may issue, the applicant must satisfy the requirements of 40 C.F.R. 230.10(a), which requires that the proposed discharge must be the "least environmentally damaging practicable alternative, after considering aquatic and non-aquatic alternatives as appropriate." 57 Fed.Reg. 32523, 32524. However, 40 C.F.R. 230.10(a)(2) further provides that:
An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.
In a November 8, 1999 letter to the U.S. Fish and Wildlife Service, the EPA stated that:
[T]he Guidelines at 40 CFR 230.7(b)(1) state that "consideration of alternatives in section 230.10(a) are not directly applicable to General permits "(emphasis added.) Therefore, water dependent activities authorized under a general permit (such as GP 23) do not have to meet the same rigorous alternatives analysis as a non-water dependent activity evaluated under an individual permit. While it may be possible that under certain conditions bogs may be able to be constructed in uplands, that possibility does not change the alternatives threshold given to water dependent activities under the Guidelines, particularly those authorized under a general permit.
As we have previously noted, the federal government has thus far declined to mandate the usage of uplands as an alternative to the expansion of bogs in wetlands as a condition for obtaining a NWP34 permit. Comments at 61 Fed. Reg. 65904. Because NWP34 does not mandate the consideration of upland alternatives, it cannot be said that GP23 is less stringent than the federal permit plan. Unlike NWP34, GP32 specifically requires the applicant to "demonstrate that there is no suitable upland area available" when expanding into Atlantic white-cedar wetlands.

III.
Appellants assert that GP23 is invalid because it was issued in violation of the non-degradation requirements of the State's Surface Water Quality Standards (SWQS) in N.J.A.C. 7:9B-1.1 et seq.
The Pinelands have been designated National Resource waters and the SWQS's antidegradation policies require that:
No changes shall be allowed in waters which constitute an outstanding National or State resource or in waters that may affect these outstanding resource waters. N.J.A.C. 7:9B-1.5(d)(4).
Moreover, in regard to the Pinelands, the SWQS specifically state:
For Pinelands waters, the Department shall not approve any activity which alone or in combination with any other *647 activities, might cause changes, other than toward natural water quality, in the existing surface water quality characteristics.

[N.J.A.C. 7:9B-1.5(d)(6)(ii)].
This rule also states: "This policy is not intended to interfere with water control in the operation of cranberry bogs...." N.J.A.C. 7:9B-1.5(d)(6)(ii)(1).
Appellants argue that while the cranberry growers' water control activities are exempted from SWQS standards, the discharge of pesticides by the growers is not covered under this exemption, and therefore violates this regulation. Thus, they maintain that GP23 is in violation of the SWQS because it permits such discharges to take place.
The appellants are mistaken. The above SWQS exemption for the water control activities also applies to the pesticide content of the water. This conclusion is based upon the specific language of the exemption: "This policy is not intended to interfere with water control ...." (emphasis added). The usage of the term "interfere" indicates that the regulatory agencies will not undertake an examination of the chemical content of the water. If the SWQS were to require a prohibition of water control activities based upon their chemical content, then there would be an "interference" with such activities. This is specifically prohibited.
Moreover, this interpretation is consistent with the fact that under the NJPDES[11] permit system, this activity would be exempted from regulation. N.J.A.C. 7:14A-2.1(d). That provision requires permits for all discharges of pollutants into surface and ground waters of the State. However, it exempts "pollutants from nonpoint source agricultural and silvicultural activities, including runoff from orchards, cultivated crops, pastures, range lands, and forest lands" as well as "return flows from irrigated agriculture." N.J.A.C. 7:14A-2.5(a)(4),(5).
This provision broadly exempts all "pollutants" contained in runoffs and discharges and is not limited solely to water. Thus, reading the above provisions together, it is clear that the State's environmental agencies have intended to provide a broad exemption for these water discharges, inclusive of the water's content.

IV.
Finally, the appellants claim that the DEP violated the Administrative Procedure Act by a "critical misrepresentation." They assert that the DEP's decision to promulgate GP23 was affected by alleged misrepresentations on behalf of the cranberry industry regarding their acreage needs. They rely upon a newspaper article which claims that various cranberry growers have illegally expanded their operations by as much as 400 acres. See Ronald Smothers, Groups Say Cranberry Growers Mislead on Acreage Needs, N.Y. Times, September 13, 1999, at B6.[12]
Aside from the hearsay nature of this article, the appellants' claim cannot be sustained. The record reveals that the acreage needs of the cranberry growers was not a consideration in the DEP and the EPA's decision to promulgate GP23.
*648 Specifically, in adopting the regulation the DEP stated:

The Department's function is not to evaluate cranberry growers' projections as to their need for new bogs in the future. Rather, the Department evaluates the impact of the activities and bases its decision on whether the statutory standard for adoption of a general permit, set forth in the Freshwater Wetlands Protection Act at N.J.S.A. 13:9B-23c, has been met.

[31 N.J.R. 2967 (emphasis added).]
Moreover, the EPA has stated that while it is "concerned about potential violations by the cranberry industry in the Pinelands" these allegations cannot enter into its decision making process for the GP. It also stated that, "[p]roject need is not a requirement under the CWA Section 404(b)(1) Guidelines (hereinafter `the Guidelines') for evaluating nationwide permits (NWP) or general permits...."
The fact that "project need" was not a consideration in the decision to promulgate GP23 is further underscored by the DEP's acknowledgment that, at the time of its decision, there was a surplus of cranberries. 31 N.J.R. 2967. If "project need" was not considered by either the DEP or the EPA in deciding to implement GP23, any alleged misrepresentations made by the cranberry industry regarding their acreage needs would appear irrelevant.
Affirmed.
NOTES
[1] "Appellants" are: American Littoral Society, Environmental Defense Fund, National Wildlife Federation, New Jersey Audubon Society, New Jersey Environmental Federation, New Jersey Environmental Lobby, New Jersey Public Interest Research Group Citizen Lobby, Inc., Sierra Club, New Jersey Chapter, New Jersey Conservation Foundation and Pinelands Preservation Alliance.

Although the Rutgers Environmental Law Clinic furnished legal representation for these parties, it failed to list the parties that it was representing on the face of the briefs and appendix submitted to this court as required by R. 2:6-6(a)(4). The rule does not contemplate that the word "appellant" or "respondent" is sufficient designation.
[2] The parallel cite to the CWA is at § 404. For purposes of this opinion we cite to 33 U.S.C.A.
[3] These entities, while exempt from State FWPA permitting requirements, must still conform to federal permitting requirements.
[4] The general permits are issued by the EPA and Secretary. They may be nationwide (NWP) or cover a state or region. The activities covered are listed by paragraph numbers in the Federal Register. See 56 Fed.Reg. 59110, 59140-59145. Entities seeking to act under these permits must receive an "authorization" to conduct their permitted activities. See generally, 33 C.F.R. 330.2, 33 C.F.R. 330.6. An authorization "means that specific activities that qualify for an NWP may proceed, provided that the terms of the NWP are met." 33 C.F.R. 330.2(c).
[5] Although the cultivation of cranberries is a water dependent activity, "the following activities often associated with the cultivation and harvesting of cranberries are not considered water dependent: construction of roads, ditches, reservoirs, and pump houses that are used during the cultivation of cranberries, and construction of secondary support facilities for shipping, storage, packaging, parking, etc." 57 Fed.Reg. 32523, 32524.
[6] In order to grant approval, the EPA must first determine that the permit will have no more than the minimal adverse environmental effects on the aquatic environment. 33 U.S.C.A. § 1344(c); 40 C.F.R. 233.50.
[7] An "impact" is defined as either a loss and/or disturbance.
[8] According to a June 1996 letter to the DEP, the EPA referred to PDCs as: "a form of transfer development rights established under the Pinelands Comprehensive Management Plan and apply to those areas administered by the Pinelands Commission.... PDCs are typically sold to buyers in the regional growth areas of the Pinelands where there are less restrictions on development. These buyers can then use these credits to increase the allowable development densities for their properties in these areas."
[9] GP23 became effective on April 3,2002. See N.J.A.C. 7:7A-9.23(u); 32 N.J.R. 1253(a).
[10] N.J.S.A. 13:9B-6 became effective on July 1, 1988. The State's assumption of the federal permitting process became effective on March 2, 1994. 59 Fed.Reg. 9933.
[11] This is an acronym for New Jersey Pollutant Discharge Elimination System.
[12] The plaintiffs ask the court to take judicial notice of the New York Times article, which is hearsay not falling under any exceptions to the rule. N.J.R.E. 801(c). See State v. Smith, 306 N.J.Super. 370, 377, 703 A.2d 954 (App. Div.1997); Sheitelman, Inc. v. Hoffman, 106 N.J.Super. 353, 255 A.2d 807 (App.Div.1969). We decline to take judicial notice, as this document falls well outside the purview of N.J.R.E. 201.