In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 19-1130

MENOMINEE INDIAN TRIBE OF WISCONSIN,

*Plaintiff-Appellant,*

*v.*

ENVIRONMENTAL PROTECTION AGENCY and UNITED STATES
ARMY CORPS OF ENGINEERS, *et al.*

*Defendants-Appellees,*

*and*

AQUILA RESOURCES, INC.,

*Intervening Defendant-Appellee.*

———————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:18-cv-108 — **William C. Griesbach**, *Judge.*

———————

ARGUED SEPTEMBER 5, 2019 — DECIDED JANUARY 27, 2020

———————

Before SYKES, HAMILTON, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* For the Menominee Indian Tribe,
the river that bears its name is a place of special importance.

The Menominee River runs along the border between Northern Wisconsin and Michigan's Upper Peninsula. According to its origin story, the Tribe came into existence along the banks of the River thousands of years ago. This birthplace contains artifacts and sacred sites of historic and cultural importance to the Tribe. All these years later, the Tribe returns to the riverbanks for ceremonies and celebrations.

Sometime before 2017, the Tribe learned that Aquila Resources intended to embark on a mining project known as the Back Forty alongside the Menominee River and in close proximity to Wisconsin's northeast border. Aquila successfully applied for several necessary permits from the state of Michigan. Concerned the project would disrupt and dislocate aspects of tribal life, the Tribe wrote letters to the Environmental Protection Agency and Army Corps of Engineers asking both agencies to reconsider its 1984 decision to allow Michigan, instead of the federal government, to issue certain permits under the Clean Water Act. The EPA and Army Corps responded not by revisiting the prior delegation of permitting authority but instead by informing the Tribe of what it already knew—that Michigan would decide whether to issue a so-called dredge-and-fill permit to authorize Aquila's Back Forty project.

The Tribe responded on two fronts—first by commencing an administrative proceeding in Michigan and second by filing suit in federal court in Wisconsin. The district court dismissed the Tribe's complaint on the ground that it did not challenge any final action taken by the EPA or Army Corps. The court also denied the Tribe's request to amend its complaint. Despite reservations about how the federal agencies responded to the Tribe's concerns, we affirm.

## I

To open and operate the Back Forty mine, Aquila had to acquire several regulatory permits. The focus here is on Aquila's need for a dredge-and-fill permit, which comes under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and allows its holder to fill wetlands.

Section 404 regulation is not an entirely federal undertaking. Although the EPA and Army Corps are tasked with enforcing the Clean Water Act, Congress allows states to apply to assume Section 404 permitting authority over waters in their jurisdictions. See 33 U.S.C. § 1344(g)–(h). Michigan is one of only two states that has implemented a Section 404 permit program. See 40 C.F.R. § 233.70 (codifying Michigan's assumption of dredge-and-fill permitting over certain waters).

When a state assumes permitting authority, the federal government is not removed from the Section 404 regulatory process altogether. The EPA maintains an oversight role reviewing state-proposed permits. See 33 U.S.C. § 1344(j). A state may not issue a proposed permit if the EPA objects. See *id*. The EPA and Corps also continue to hold regulatory authority over waterways that flow between states and can be used for commercial activity, as Congress determined that those waters cannot be delegated to state control. See *id*. § 1344(g)(1) (providing that federal agencies issue permits for navigable waters—defined as those waters used or susceptible to use in interstate commerce).

Knowing that Michigan had received authority for dredge-and-fill permitting in 1984, Aquila directed its Section 404 application to Michigan's Department of Environmental Quality. The company's application, and the Back Forty

project more generally, concern the Menominee Tribe. The Tribe fears that some of its sacred sites could be damaged by changes to the River and increased activity on its banks. Tribal members often go to the River's banks to visit the burial mounds of tribal ancestors and to perform and participate in ceremonies. Recently the Tribe reports working to reestablish wild rice at the mouth of the River to preserve and continue its traditional agricultural practices. The Tribe also became of the view that the recent growth of commercial activity on the Menominee River meant that the federal government, not Michigan, should be in charge of permitting.

In August 2017 the Tribe expressed its concerns in letters to the EPA and Army Corps. The Tribe acknowledged that under the 1984 agreement between the EPA and Michigan, the state took over issuance of dredge-and-fill permits for many of the state's waterways, subject to the EPA's oversight preserved in the Clean Water Act. See 33 U.S.C. § 1344(j). But the Tribe emphasized that circumstances had changed since the 1984 delegation. In the past 35 years, the Tribe explained, the Menominee River had experienced a growth of commercial activity, including riverboat tourism. This commercial activity, the Tribe continued, had a legal consequence: the segment of the Menominee River nearest to the proposed Back Forty mining site constituted a navigable waterway within the meaning of the Clean Water Act and therefore permitting for it could not remain delegated to the state. The Tribe asked the EPA and Corps to revisit whether they—as opposed to the state of Michigan—should exercise authority over Aquila's Back Forty permit application. At the very least, the Tribe sought to consult with the EPA and Corps before Michigan made any decision about the Back Forty project.

Who decides the permitting question matters greatly to the Tribe, and for good reason. The Tribe sought to negotiate directly with the federal government because the United States has a long-recognized general trust responsibility toward Native Americans. See *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942) (explaining government's "moral obligations of the highest responsibility and trust" toward Indian communities); see also *United States v. Mitchell*, 463 U.S. 206, 225–26 (1983) (emphasizing the same point).

The Tribe also saw specific procedural and legal benefits to the dredge-and-fill permit being decided by the federal agencies. If the permitting had been handled in the federal system, the Tribe would have enjoyed more participation rights. For example, the National Environmental Policy Act would have applied and likely required the EPA to complete an environmental assessment or impact statement about the Back Forty mine. See 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1501.3, 1501.4. Through that process, the Tribe would have an opportunity to request consultation with federal environmental officials. See 40 C.F.R. §§ 1501.2(d)(2), 1501.7(a)(1).

The agencies responded by reinforcing—but not revisiting—the 1984 delegation. For its part, the Corps explained that it could not exercise jurisdiction over the permitting process for the Back Forty mine because permitting for the relevant section of the Menominee River had been assumed by Michigan in 1984. One month later, the Tribe received a six-sentence letter from the EPA not at all addressing its concerns but offering to speak with the Tribe by phone. Neither response addressed the Tribe's request for the agencies to reconsider whether changed circumstances warranted the renewed exercise of federal authority over the relevant section

of the Menominee River. Taking those letters as non-responsive, the Tribe turned to the courts and filed this lawsuit in the Eastern District of Wisconsin, naming the EPA, Army Corps, and the agencies' secretaries as defendants.

The federal lawsuit did not proceed very far. Aquila intervened in the action and joined the agencies in moving under Federal Rule of Civil Procedure 12(b)(1) and (6) to dismiss the Tribe's complaint. The district court granted the motion on the basis that the challenged EPA and Army Corps letters were not "final agency actions" within the meaning of Section 704 of the Administrative Procedure Act and therefore were not subject to judicial review.

At the same time, the Michigan Department of Environmental Quality continued processing Aquila's Section 404 permit application. As required under its agreement with the EPA, Michigan submitted its proposed dredge-and-fill permit for Aquila's mine to the EPA for federal review. The EPA objected to the permit and asked Michigan for additional information. A few months later, the state submitted a new draft permit. Upon reviewing the new draft and Michigan's responses, the EPA withdrew its prior objections on the basis that its concerns had been alleviated. More specifically, the EPA allowed permitting to proceed if certain conditions were included in the final state permit. The state complied and granted Aquila the permit in June 2018. Shortly thereafter the Tribe challenged the permit in Michigan's administrative system. That case is still pending.

## II

This appeal presents two questions—one narrow and one broad. The first is whether the agency action here is judicially

reviewable. The broader question asks what legal avenue is available for the Tribe to seek review of the state delegation of the permitting process for the part of the Menominee River affected by the Back Forty project in light of changed circumstances.

## A

We begin with the narrow question, which returns us to the Tribe's complaint. The Tribe invoked the Administrative Procedure Act and alleged that the federal agencies' decision not to exercise permitting authority over the dredge-and-fill permit for the Back Forty project was arbitrary and capricious and contrary to law. See 5 U.S.C. § 702. The district court concluded that it lacked authority to review that question because it was not a "final agency action" within the meaning of the APA.

The APA limits judicial review to "final agency action[s]." 5 U.S.C. § 704. The Supreme Court has explained that to constitute a final action, the decision in question "must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and it must "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotations omitted).

The district court applied this framework and concluded that the EPA and Army Corps's letters did not reflect any final agency decisions. We agree. The EPA and Corps's responses did little but restate what the Tribe already knew—that Michigan, as a result of the 1984 delegation, had permitting authority over the section of the Menominee River near the Back

Forty site. A letter "purely informational in nature" is not a final agency action because it "impose[s] no obligations and denie[s] no relief." See *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004). Letters restating earlier interpretations likewise do not carry legal consequences for purposes of the "final agency action" requirement. See *Clayton County v. Fed. Aviation Admin.*, 887 F.3d 1262, 1268 (11th Cir. 2018). Because the Corps and EPA letters only reiterated the status quo, there was nothing for the district court (or now, us) to review.

The Tribe understandably will find this conclusion unsettling. Its letters to the EPA and the Army Corps were detailed and specific. The Tribe explained its basis for believing that the relevant part of the Menominee River should be under federal permitting authority. Neither the EPA nor the Corps accepted the Tribe's invitation to revisit the 1984 delegation decision in light of the changed commercial circumstances highlighted in the Tribe's letters. Indeed, neither agency responded in any way to that contention. This silence is particularly troubling since the agencies asserted for the first time at oral argument that the Tribe could have sought the requested relief by filing a petition for rulemaking under 5 U.S.C. § 553(e). We are at a loss to understand why the EPA and the Army Corps did not inform the Tribe of this route upon receiving its letters.

Although we see nothing standing in the way of the Tribe's ability to file a § 553(e) petition at this point, it may be too late for any rulemaking to affect the dredge-and-fill permit at issue in this case. This further adds to our sense that the Tribe got the runaround here.

B

Even if we could somehow treat the agency responses as reflecting final decisions, our next step would be far from clear given parallel proceedings ongoing in Michigan. In addition to filing suit in federal court, the Tribe contested Aquila's Section 404 permit before the Michigan Department of Environmental Quality. To our knowledge that proceeding (which is called a contested case hearing) is pending before Michigan's Administrative Hearing System. See MICH. ADMIN. CODE r. 792.10301–.10306. And, if it does not prevail, the Tribe can seek review of the outcome of the contested case hearing in state court. See MICH. COMP. LAWS §§ 24.302–.305.

Duplicative litigation in state and federal courts can cause coordination problems, interfere with effective government functioning, and lead to conflicting judgments. See, *e.g.*, *Colorado River Water Cons. Dist. v. United States*, 424 U.S. 800, 817 (1976). The Tribe sees those concerns as overstated because it perceives the scope of the state proceedings to be narrow. It says that there will be no overlap between the state and federal suits because the state administrative proceeding will not entail an adjudication of Michigan's dredge-and-fill permitting authority under the Clean Water Act. For support, it notes that in denying a motion for a stay, the administrative law judge ruled on only state-law grounds.

But the administrative law judge has not yet reached a decision on the merits, and after that the Tribe may turn to the state court for relief. As the Tribe acknowledged in its letter to the EPA and the Corps, the definition of "navigability" is ultimately decided by the judiciary. See 33 C.F.R. § 329.3. The ultimate decider need not be the federal judiciary, though. State courts are equally able to adjudicate questions of federal

law. See *Tafflin v. Levitt*, 493 U.S. 455, 459 (1990) (noting the "deeply rooted presumption" of concurrent jurisdiction over cases arising under federal law unless Congress decides otherwise). It is not the unique province of the federal courts to adjudicate administrative law challenges related to the Clean Water Act. See, *e.g.*, *In re Freshwater Wetlands Prot. Act Rules*, 798 A.2d 634, 643 (N.J. Super. Ct. App. Div. 2002) (evaluating whether state 404 permit met federal standards); see also *Sierra Club Mackinac Chapter v. Dep't of Envtl. Quality*, 747 N.W.2d 321, 331–32, 335 (Mich. App. 2008) (concluding that pollution-discharge permit violated the Clean Water Act). Nothing has been brought to our attention to suggest that the Tribe cannot receive full and fair review in a Michigan court.

## III

The Tribe also challenges the district court's denial of its motion for leave to amend its complaint. The Tribe sought to add two Administrative Procedure Act claims—one contending that the EPA's withdrawal of its objections to Michigan's issuance of the permit was arbitrary and capricious, and a second alleging that the agencies failed to consult with the Tribe about the Back Forty mine as Congress required under the National Historic Preservation Act. The district court denied the motion on the basis of futility, reasoning that neither claim would survive a motion to dismiss. We review a denial of a motion for leave to amend for abuse of discretion, while considering any embedded legal questions *de novo*. See *Gandhi v. Sitara Capital Mgmt., LLC*, 721 F.3d 865, 868–69 (7th Cir. 2013).

### A

To evaluate the Tribe's claim that the EPA's withdrawal of objections to Michigan's proposed permit was arbitrary and

capricious, we must revisit the regulatory scheme. Recall that where Section 404 permitting authority has been delegated to a state, the EPA retains an oversight role. See 33 U.S.C. § 1344(j). The EPA reviews, and can object to, proposed permits. See *id*. If the agency lodges objections, the state cannot issue a permit without revising and resubmitting it for approval. See *id*.; see also 40 C.F.R. § 233.50.

The EPA originally objected to Michigan's proposed dredge-and-fill permit for Aquila's Back Forty project on multiple grounds and sought more information. Michigan submitted a revised permit and agreed to add additional conditions, including, for example, a requirement that Aquila monitor the effect of dust levels on nearby wetlands. Upon its second review, EPA concluded that its concerns were resolved and allowed the permit to go forward.

In the district court, the Tribe sought leave to amend its complaint to challenge the EPA's withdrawal of its objections to the permit that Michigan planned to issue to Aquila. The Tribe asserts that the EPA provided little to no explanation, rendering its decision arbitrary and unsupported. The district court, however, concluded that the proposed claim would fail (and therefore be futile) because the EPA's decision was exempt from judicial review as a matter of law. Specifically, the district court reasoned that the EPA's decision to withdraw its objections was "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

The Supreme Court has explained that § 701's limitation on judicial review is "a very narrow exception" applicable only when there is "no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). Discretionary enforcement decisions reflect one category of agency

decisions that the Supreme Court has identified as unsuitable for judicial review. A clear illustration came in *Heckler v. Cheney*, 470 U.S. 821 (1985). There the Court explained that courts generally do not review agency decisions about whether to bring an enforcement action because such a decision "often involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* at 831. Such factors, the Court underscored, include resource constraints and policy priorities. See *id.*

When deciding whether a decision is committed to agency discretion, we first review the applicable statutes and regulations. See *Head Start Family Educ. Program, Inc. v. Coop. Educ. Serv. Agency 11*, 46 F.3d 629, 632 (7th Cir. 1995). We examine those measures to see if they contain "judicially manageable standards . . . for judging how and when an agency should exercise its discretion." *Heckler*, 470 U.S. at 830; see also *Miami Nation of Indians of Ind. v. Dept. of Interior*, 255 F.3d 342, 348–49 (7th Cir. 2001) (examining regulations governing the tribal recognition process to determine if they contain criteria that "courts are capable of applying").

The Tribe does not point to any regulations governing the withdrawal of objections. We searched too and came up empty, finding no statute, regulation, or guideline that instructs the EPA how to decide whether a state has tendered a satisfactory resolution to a previous permitting objection. The Tribe suggests that we fill the gap by looking to the regulations governing the decision to object in the first place. It notes that those regulations require that any objection "be based on the [EPA's] determination" that the proposed permit is "outside [the] requirements of the [Clean Water] Act, these regulations, or the 404(b)(1) Guidelines." 40 C.F.R. § 233.50(e). On

the surface, the Tribe's argument makes sound sense: the same reasons that the EPA might object could, the reasoning runs, be used to decide when a permit can go forward.

We read the regulatory language another way, though. Remember that the language about objections is permissive, making plain that "[a]ny such objection" the EPA chooses to lodge must be based on certain prescribed factors. *Id*. The initial choice—the decision whether to object—remains discretionary. That discretion remains no matter how much a particular permitting proposal may, as an objective matter, deviate from the prescribed regulatory standards. See *id*.; see also *Heckler*, 470 U.S. at 835–37 (explaining that agency action was unreviewable where nothing in the regulatory scheme compelled enforcement in the event of violations); *American Paper Inst. v. EPA*, 890 F.2d 869, 878 (7th Cir. 1989) (concluding that the EPA's decision to object to a state-issued permit in a similarly structured pollutant-discharge program under the Clean Water Act was committed to agency discretion).

The proper conclusion, then, is that, in the absence of any regulation addressing the basis for the decision to withdraw an objection, the choice is as committed to the agency's discretion as the decision to object in the first instance. If the EPA finds a shortcoming in the state's response to a particular objection, the agency must again make a judgment call about whether to maintain the objection. The decision may depend on many factors, including the EPA's judgment about not only the materiality of the concern that gave rise to the initial objection and the sufficiency of the state's responsive measures, but also whether the agency's limited time and resources are best used to persist with an objection pertinent to one project when others likewise call for federal attention.

The Tribe would be on much stronger footing if the Clean Water Act's regulatory scheme required the EPA to object if certain conditions were not met. See, *e.g.*, *Amador County v. Salazar*, 640 F.3d 373, 376–77 (D.C. Cir. 2011) (rejecting the argument that the Secretary of the Interior's acceptance of a state-tribal compact was committed to agency discretion because the law at issue obligated the Secretary to disapprove of compacts that violated the regulatory scheme). But the difference in the Section 404 context—that the agency is not compelled to address all defects in every proposed dredge-and-fill permit—is that the withdrawal decision is committed to the EPA's discretion. And it is that reality that requires us to reject the Tribe's proposed claim.

A final and broader point is worth observing. The Clean Water Act's regulations allow the EPA to decline to review whole categories of state-issued dredge-and-fill permits through a blanket waiver program. See 40 C.F.R. § 233.51; see also *Save the Bay, Inc. v. EPA*, 556 F.2d 1282, 1295 (5th Cir. 1977) (noting similar feature of the Clean Water Act pollutant discharge program as support for concluding that EPA decision not to veto a permit was committed to agency discretion and therefore not subject to judicial review). It makes little sense to apply a strict set of criteria for withdrawing objections when the regulatory scheme allows the EPA to assign wholesale its review authority and put permitting completely in the hands of the state officials. That expansive delegation authority reinforces our conclusion that the Clean Water Act commits dredge-and-fill permit objections and subsequent withdrawals to the EPA's discretion.

B

The Tribe also sought leave to add another APA claim—that the EPA had failed to recognize the Tribe's consultation rights conferred by the National Historical Preservation Act. See 5 U.S.C. § 706(1) (authorizing courts to "compel agency action unlawfully withheld or unreasonably delayed"). The Preservation Act creates a consultation requirement for certain federal "undertaking[s]." 54 U.S.C. § 306108. The federal agency overseeing the project must, before approving funding or licensure, "take into account the effect of the undertaking on any historic property." *Id.* The Preservation Act emphasizes the importance of protecting the interests of recognized Indian tribes and requires consultation when an undertaking would alter historic property of religious or cultural significance to a tribe. See *id.* §§ 302701, 306102(b)(5)(B).

The Tribe reads the Preservation Act as obligating the EPA and Army Corps to consult with it about the Back Forty mine project. But that position is mistaken. The Preservation Act applies only to undertakings that are "[f]ederal or federally assisted." *Id.* § 306108. The Tribe alleged neither federal funding nor federal assistance. We have held that the procedural requirements of the statute do not apply to projects for which no federal support has been sought, "no federal dollars have been obligated, and no federal license is required." *Old Town Neighborhood Ass'n Inc. v. Kauffman*, 333 F.3d 732, 735 (7th Cir. 2003). Because the Back Forty mine is privately funded and state-licensed, the Preservation Act's consultation requirement is not triggered here.

**\* \* \***

The Menominee Indian Tribe of Wisconsin's sincere efforts to protect its cultural heritage ran into a legal labyrinth and regulatory misdirection. Had the federal agencies provided a meaningful response to the Tribe's concerns, perhaps this suit could have been avoided. But in light of the regulatory scheme that we cannot change, the resolution of this case is clear. We cannot review the agency action here. In these circumstances, the Tribe is left to pursue its challenge in the Michigan administrative system and state courts. And we are left to AFFIRM the judgment of the district court.

HAMILTON, *Circuit Judge*, concurring. I agree that the EPA and Army Corps letters were not final agency actions, 5 U.S.C. § 704, and that the EPA's decision to withdraw its objections to the Michigan permit was committed to agency discretion by law, *id.* § 701(a)(2). As a result, the federal courts lack authority to intervene in this dispute at this juncture. I write separately (a) to highlight the problem with the statutory standard that allows the federal government to delegate Clean Water Act permitting to the State of Michigan and (b) to emphasize that the Tribe can still pursue its challenges to the Back Forty mine under Section 404 of the Act, 33 U.S.C. § 1344, through the EPA and the Michigan state courts.

A delegation of Clean Water Act permitting authority to a state under 33 U.S.C. § 1344(g) must, as a practical matter, reflect a fairly long-term commitment. The practical problem with the statutory standard is that the state's permissible jurisdiction over waters depends on facts that can change over time. The delegation may not include major waterways, though. The statute bars delegation for "waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark" and adjacent wetlands. 33 U.S.C. § 1344(g)(1). Under this standard, as uses of particular stretches of waterways may change, so may the legality of a federal delegation of authority to a state. As applied to the Menominee River near the proposed Back Forty mine, there is a substantial issue whether the original delegation in 1984 remains valid as a matter of federal law.

That issue is not teed up for federal courts to decide in this case, as Judge Scudder has explained. That does not mean the issue is closed, however.

First, the Tribe may petition the EPA to reassume federal permitting authority over this stretch of the Menominee River as an amendment to a rule. See 5 U.S.C. § 553(e). The EPA's 1984 approval of Michigan's Section 404 permit program bore the hallmarks of a legislative rule. See 49 Fed. Reg. 38,947 (Oct. 2, 1984), codified at 40 C.F.R. § 233.70. The approval was written as a "regulation" that was promulgated after public notice and comment. See *id.* at 38,947; see also 40 C.F.R. § 233.15(e) (providing for public participation in state program approvals). The EPA would have a duty to respond to any petition for revisions to the scope of the Michigan delegation. See *Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior*, 794 F. Supp. 2d 39, 44 (D.D.C. 2011) ("an agency 'is required to at least definitively respond to . . . [a] petition—that is, to either deny or grant the petition" (alteration in original)).

If the Tribe submits such a petition, the EPA will have to answer within a reasonable time. See 5 U.S.C. § 555(b) (requiring an agency to "conclude a matter presented to it" within "a reasonable time"); *id.* § 706(1) (a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed"); see also *Envtl. Integrity Project v. EPA*, 160 F. Supp. 3d 50, 54 (D.D.C. 2015) ("the APA is the source of an agency's duty to respond to a petition for rulemaking . . . within a reasonable time . . . ."); *Families for Freedom v. Napolitano*, 628 F. Supp. 2d 535, 540 (S.D.N.Y. 2009) (holding that delay in deciding a rulemaking petition was unreasonable and ordering response within thirty days). The D.C. Circuit has set forth a general framework for deciding claims of agency delay that

courts can apply to unanswered rulemaking petitions. See *Telecommunications Research & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (identifying six factors to evaluate); *Families for Freedom*, 628 F. Supp. 2d at 540 (applying *TRAC* factors in this context).

Absent periodic review by the EPA, the scope of a Section 404 delegation to a state could quickly fall behind the times and out of legal compliance. This case illustrates that risk. As codified, the Michigan approval incorporated a Memorandum of Agreement signed in the spring of 1984 that retained just a small portion of the Menominee River under federal jurisdiction. See 40 C.F.R. § 233.70(c)(2); Joint App. at 163, 166, 168. But rivers change, and so does the commerce they carry. The nearly forty-year-old memorandum might no longer reflect actual conditions. The EPA may need to decide, on its own initiative or in response a petition by the Tribe, whether the 1984 delegation is still viable as applied to the Menominee River near the Back Forty mine.

A reassessment by the EPA to ensure that the scope of the Michigan delegation still complies with the Clean Water Act appears long overdue. I don't mean to criticize § 1344(g)(1); the statute reflects policy compromises that are of course up to Congress. But since Congress chose to make the scope of permissible delegation depend on circumstances that can change decisively over time, agencies and courts must do their best to comply. The Act also provides that the EPA "shall" withdraw approval of a state program not administered "in accordance with this section," including the jurisdictional provision. 33 U.S.C. § 1344(i). I express no view on whether or how such a withdrawal would affect current controversies like this case.

Second, as Judge Scudder's opinion for the panel observes, the Tribe may argue in state court that Michigan lacks permitting jurisdiction over this portion of the Menominee River under § 1344(g)(1). If the Tribe raises that issue of federal law, a state court will need to decide it. Michigan courts have heard Clean Water Act challenges to state actions. See *Sierra Club Mackinac Chapter v. Dep't of Envtl. Quality*, 747 N.W.2d 321, 331–32, 335 (Mich. App. 2008) (ruling that Michigan courts had jurisdiction over claim that general permit violated the Clean Water Act and finding such a violation). If the Tribe were to prevail in state court on its jurisdictional argument, such a decision would deprive Michigan environmental officials of "adequate authority to carry out" the state program on this stretch of river. 33 U.S.C. § 1344(g)(1). That decision would presumably require the EPA to reassume federal authority, exercising its power under § 1344(i) if necessary.

The Tribe objects that the Michigan administrative law judge who is hearing the "contested case" has refused to address the questions of federal law, including a challenge to the scope of the federal delegation of permitting authority. See Order on Motion to Stay, *Petitions of Thomas Boerner et al.*, No. 18-013058 at 2–3 (Mich. Admin. Hearing Sys. Jan. 29, 2019) (attached to Appellant's Br.). I express no view on the administrative law judge's refusal to consider the scope of the delegation as a matter of Michigan administrative law, but limits on the issues that administrative law judges may consider are not unusual. Whether the administrative law judge is right or wrong, however, should not affect the power of Michigan courts of general jurisdiction to address the issue.

If the Tribe seeks judicial review in a Michigan circuit court, see Mich. Comp. Laws §§ 24.302–.305, that court will be

bound to examine a jurisdictional challenge based on federal law. "State courts, like federal courts, have a constitutional obligation to safeguard personal liberties and to uphold federal law." *Stone v. Powell*, 428 U.S. 465, 494 n.35 (1976); *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 340–44 (1816) (Supremacy Clause requires both federal and state judges to decide cases "according to the constitution, laws and treaties of the United States"); see also *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 477–78 (1981) (recognizing state courts' duty to apply binding federal law). If the state courts reject the Tribe's arguments under federal law, review would ultimately lie with the Supreme Court under 28 U.S.C. § 1257.

For now, however, the EPA's 1984 delegation of authority over this stretch of the Menominee River to Michigan remains in effect. For that reason, we must affirm. The Tribe must ask the EPA, the Michigan ALJ, and Michigan courts to examine alleged infirmities in the Section 404 permit for the mine.