852 A.2d 167

IN THE MATTER OF FRESHWATER WETLANDS PROTECTION ACT RULES, STATEWIDE GENERAL PERMIT, CRANBERRY EXPANSION, PROMULGATED BY NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION.

Argued September 8, 2003—Decided July 20, 2004.

416

*Thomas A. Borden* argued the cause for appellants, American Littoral Society, Environmental Defense Fund, National Wildlife Federation, New Jersey Audubon Society, New Jersey Environmental Federation, New Jersey Environmental Lobby, New Jersey Public Interest Research Group Citizen Lobby, Inc., Sierra Club, New Jersey Chapter, and Pinelands Preservation Alliance (*Rutgers Environmental Law Clinic,* attorneys; *Edward L. Lloyd,* of counsel).

*Rachel J. Horowitz,* Deputy Attorney General, argued the cause for respondent, New Jersey Department of Environmental Protection (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Patrick DeAlmeida,* Deputy Attorney General, of counsel).

Chief Justice PORITZ delivered the opinion of the Court.

This case raises questions in respect of the validity of General Permit 23 (GP23), *N.J.A.C.* 7:7A–5.23, adopted by the New Jersey Department of Environmental Protection (DEP) in 1999.[1] Appellants[2] claim that GP23, which permits the limited expansion of existing cranberry growing operations in the Pinelands National Reserve, violates provisions of the Federal Water Pollution Control Act Amendments of 1972, commonly known as the Clean Water Act (CWA), 33 *U.S.C.A.* § 1344, the Freshwater Wetlands Protection Act (FWPA), *N.J.S.A.* 13:9B–1 to –30, and the State's Surface Water Quality Standards (SWQS), *N.J.A.C.* 7:9B–1.1 *et seq.* A unanimous panel of the Appellate Division rejected appellants' challenge in its entirety. *In re Freshwater Wetlands Prot. Act Rules, Statewide General Permit, Cranberry Expansion, Promulgated by the New Jersey Dep't of Envtl. Prot. (In re FWPA)*, 351 *N.J.Super.* 362, 798 *A.*2d 634 (2002). We granted certification on December 16, 2002, 175 *N.J.* 171, 814 *A.*2d 636, and now affirm.

### I.

This Court previously has had occasion to discuss the "unique ecological, economic, and cultural features of the New Jersey Pine Barrens, or Pinelands." *Gardner v. New Jersey Pinelands Comm'n*, 125 *N.J.* 193, 198, 593 *A.*2d 251 (1991). *Gardner* described the pinelands and discussed the purpose of the regulatory programs designed to protect them:

A "wilderness" of pine-oak forests and wild and scenic rivers, the Pinelands harbors a "wide variety of rare, threatened and endangered plant and animal

---

[1] General Permit 23 was codified originally at *N.J.A.C.* 7:7A–9.23, and readopted in 2001 at *N.J.A.C.* 7:7A–5.23. 33 *N.J.R.* 3045(a) (Sept. 4, 2001).

[2] Appellants are a coalition of environmental organizations that includes the American Littoral Society, Environmental Defense, National Wildlife Federation, New Jersey Audubon Society, New Jersey Environmental Federation, New Jersey Environmental Lobby, New Jersey Public Interest Research Group Citizen Lobby, Inc., Sierra Club–New Jersey Chapter, and Pinelands Preservation Alliance.

species," and encompasses "many other significant and unique ecological, historical, recreational, and other resources." The region overlies the vast, seventeen-trillion gallon Cohansey aquifer, "one of the largest virtually untapped sources of pure water in the world." There has been very little development in the Pinelands; there are no major retail centers, and developed property comprises only one or two percent of the land in most areas. Agriculture in the Pinelands, especially the cultivation of cranberries and blueberries is particularly important both nationally and locally.

In recent years, anxiety over the loss of farming and the fragile ecology of the Pinelands has produced increasingly stringent federal and state regulation .... [T]he New Jersey Pinelands Protection Act (Act), *L.* 1979, *c.* 111; *N.J.S.A.* 13:18A–1 to 29, declares that its goals are, among others, to protect, preserve, continue, and expand agriculture and horticulture and to discourage piecemeal and scattered development within the Pinelands.

[*Id.* at 199–200, 593 *A.*2d 251 (citations omitted).]

In this case, we focus on the unique role of cranberry agriculture in the history of the pinelands and the methods used to produce the fruit.

## A.

### Cranberry Agriculture in New Jersey

The high water table and sandy, acidic soils of the pinelands render the cultivation of most field crops difficult. Those same ingredients, however, are essential to the growth of the cranberry. Due to a confluence of favorable ecological and climatological variables, farmers have been harvesting cranberries in the pinelands for almost two centuries. *See* 30 *N.J.R.* 3721 (Oct. 19, 1998) (noting cranberries have been harvested in pinelands since early 1800s).

By the early 1900s, cranberry production was the region's principal industry. In the 1930s, approximately 13,000 acres of the pinelands were dedicated to cranberry agriculture. 28 *N.J.R.* 4145 (Sept. 16, 1996). More recently, market conditions and other factors have conspired to reduce the number of cranberry growing operations and the amount of acreage in production. Thus, in 1999, there were approximately forty-seven active operations in the pinelands, 31 *N.J.R.* 1571 (June 21, 1999), whereas the amount of acreage in production has fluctuated between 3100 and 4000

acres.[3] Nat'l Agric. Statistical Serv., U.S. Dep't of Agric., *2001 National Rankings, Cranberries* (2001), *available at* http://www.nass.usda.gov/nj; Nat'l Agric. Statistical Serv.; U.S. Dep't of Agric., *Cranberry Statistics by State and U.S., Total Acres Harvested, 1990–2000* (2000), *available at* http://www.nass.usda.gov/nj. Despite that decline, the State is the third-largest producer of cranberries in the country, behind only Massachusetts and Wisconsin, and the value of the 1999 harvest was approximately $7.4 million.

Although cultivation techniques have improved considerably over the years, one factor continues to dictate the location of cranberry growing operations: the fruit requires easy access to large amounts of clean water, at least 227 gallons per minute per acre of cranberry bog. 31 *N.J.R.* 1570 (June 21, 1999). Through an extensive network of reservoirs, dikes and canals, farmers use the water "to flood the bogs in winter and early spring to protect against frost, to flood the bogs during harvest, and to irrigate the bogs during the summer." *Ibid.* Most cranberry operations are situated in wetland areas where water is readily available. Indeed, the fruit is classified by the United States Army Corps of Engineers (Corps) and United States Fish and Wildlife Service as a "wetland crop species" that "must be grown in wetlands or areas altered to create a wetlands environment." U.S. Army Corps of Engr's, *Regulatory Guidance Letter 92–2,* 57 *Fed.Reg.* 32523, 32524 (July 22, 1992) (citing U.S. Fish & Wildlife Serv., *1988 National List of Plant Species that Occur in Wetlands* (1989)).

Finding suitable wetland locations for cranberry operations is only the first step. Converting the wetlands for use as a cranberry bog requires removal of the indigenous vegetation and excavation of the soil to a depth of up to three feet. After the dikes and other water control structures are built, a layer of organic soil is

---

[3] The price per barrel for cranberries collapsed in 1998 and 1999, dropping from $56.60 in 1997 to $10.90 in 1999. Nat'l Agric. Statistical Serv., U.S. Dep't of Agric., *Cranberry Statistics by State and U.S., Price Per Barrel, 1991–2000* (2000), *available at* http://www.nass.usda.gov/nj.

placed on the bottom of the bog. The soil is covered with between one and two feet of sand and, finally, the cranberry vines are planted. A newly constructed bog can take more than three years to produce its first crop. 31 *N.J.R.* 2967 (Oct. 4, 1999).

## B.

### Regulatory Environment

Building or expanding a cranberry growing operation in a wetland implicates a complex permitting scheme. Under the CWA, generally parties seeking to discharge dredged or fill material into wetlands may do so only if they have secured a "section 404" permit from the United States Army Corps of Engineers.[4] 33 *U.S.C.A.* § 1344(a). The CWA, however, specifically allows states to assume permitting authority for waters within their jurisdictions so long as the state program is at least as stringent as the federal 404 program. 33 *U.S.C.A.* § 1344(g), (h); 40 *C.F.R.* § 233.1(d). In 1987, the New Jersey Legislature enacted the FWPA, *N.J.S.A.* 13:9B-1 to -30, to satisfy federal assumption requirements, although it was not until March 2, 1994, that the State's application was approved. 40 *C.F.R.* § 233.71; *see N.J.S.A.* 13:9B-2; Oliver A. Houck & Michael Rolland, *Federalism in Wetlands Regulation: A Consideration of Delegation of Clean Water Act Section 404 and Related Programs to the States,* 54 *Md. L.Rev.* 1242, 1276–79 (1995) (detailing New Jersey's efforts to assume permitting authority).

An applicant seeking to engage in regulated activities[5] in State open waters or wetlands must apply for and secure either a

---

[4] The wetland-permitting program was established by section 404 of the Clean Water Act. Federal Water Pollution Control Act Amendments of 1972 § 404, 33 *U.S.C.A.* § 1344. Such permits are frequently referred to as section 404, or simply 404, permits. *E.g., Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Eng'rs,* 335 *F.*3d 607, 612 (7th Cir.2003).

[5] Regulated activities are defined at *N.J.S.A.* 13:9B-3 and include:

general or an individual permit from the DEP. *N.J.S.A.* 13:9B–9a. As the name implies, individual permits are project-related and are required for activities that will have substantial wetlands impacts. General permits, such as GP23, are designed to streamline the permitting process for certain activities that have only a minimal impact, individually and cumulatively, on the environment. *N.J.S.A.* 13:9B–23c. Specifically, the FWPA provides:

> The department shall issue additional general permits on a Statewide or regional basis for the following categories of activities, if the department determines, after conducting an environmental analysis and providing public notice and opportunity for a public hearing, that the activities will cause only minimal adverse environmental impacts when performed separately, will have only minimal cumulative adverse impacts on the environment, will cause only minor impacts on freshwater wetlands, will be in conformance with the purposes of this act, and will not violate any provision of the Federal Act:
>
> . . . .
>
> (5) Activities, as determined by the department, which will have no significant adverse environmental impact on freshwater wetlands, provided that the issuance of the general permit for any such activities is consistent with the provisions of the Federal Act and has been approved by the United States Environmental Protection Agency.
>
> [*Ibid.*]

A permittee's application must conform to the conditions applying to all general permits and to any conditions that are specific to the general permit sought. *N.J.A.C.* 7:7A–4.3(a), (b) (setting forth conditions for general permits, *e.g.,* requiring best management practices, barring activities that "destroy, jeopardize, or adversely modify" threatened or endangered species). In addition, DEP may place special conditions on an individual project proceeding under a general permit. *N.J.S.A.* 13:9B–23d.

---

(1) The removal, excavation, disturbance or dredging of soil, sand, gravel, or aggregate material of any kind;

(2) The drainage or disturbance of the water level or water table;

(3) The dumping, discharging or filling with any materials;

(4) The driving of pilings;

(5) The placing of obstructions;

(6) The destruction of plant life which would alter the character of a freshwater wetland, including the cutting of trees[.]

Even when federal assumption requirements have been met, DEP's authority to propose and adopt general permits is limited by the CWA. 33 *U.S.C.A.* § 1344(j). The federal Environmental Protection Agency (EPA or Agency) has continued oversight of DEP's permitting program so as to ensure that the federal and state regulatory schemes are consistent and that the state program is as rigorous as the federal 404 program. Clean Water Act Section 404 Program Definitions and Permit Exemptions; Section 404 State Program Regulations, 53 *Fed.Reg.* 20764, 20771–72 (June 6, 1988). The memorandum of agreement governing the relationship between EPA and DEP post-assumption delineates EPA's role:

> The Administrator will assess the administration and enforcement of the State Program on a continuing basis for *equivalence and consistency with the CWA*, this agreement, and all applicable federal requirements and policies for the adequacy of enforcement. This assessment will be accomplished by: (1) timely EPA review of information submitted by [DEP] in accordance with this agreement; (2) *permit overview*; (3) compliance and enforcement overview; and (4) annual review of [DEP] program activities.
>
> [ (Emphasis added).]

Thus, draft general permits proposed by the State must be forwarded to the EPA Regional Administrator, who may approve or interpose objections that, if not resolved to the Regional Administrator's satisfaction, will prevent the adoption of the permit. 40 *C.F.R.* § 233.50(a), (d); *N.J.A.C.* 7:7A–12.2(j).

## C.

### General Permit 23

GP23 represents the end product of three years of negotiation between EPA and DEP. EPA objected to DEP's first two versions of the draft permit, 30 *N.J.R.* 3721(a) (Oct. 19, 1998); 28 *N.J.R.* 4145(a) (Sept. 16, 1996), with the result that neither was adopted because EPA's concerns remained unresolved. 31 *N.J.R.* 1563 (June 21, 1999). Following the failed 1998 submission, EPA "agreed to withdraw its objection to the general permit if the [DEP] made certain changes to the proposal." *Ibid.* DEP acceded to EPA's recommendations and, after reproposing GP23 in

June of 1999, *id.* at 1562, adopted the permit on September 13, 1999. 31 *N.J.R.* 2964(a) (Oct. 4, 1999).[6]

GP23 authorizes the limited expansion of existing cranberry growing operations (as defined at *N.J.A.C.* 7:7A–5.23(a)), located in the pinelands. A GP23 authorization can only be used to create new bogs and attendant water control infrastructure, not the construction of storage facilities or housing. *N.J.A.C.* 7:7A–5.23(b). Although individual operators may theoretically expand up to fifty acres (ten acres a year for each year) during the five-year life of the permit, *id.* at (h)(1), a statewide cap of 300 acres "limit[s] the growers' activities in the aggregate." *In re FWPA, supra,* 351 *N.J.Super.* at 372, 798 *A.*2d 634 (citing *N.J.A.C.* 7:7A–5.23(i)).

The substantive provisions of GP23 are recounted in detail in the opinion below. *Id.* at 371–74, 798 *A.*2d 634. We will focus here on the significant changes to the permit made by DEP to address the EPA's objections. *Compare* 28 *N.J.R.* 4148–49 (Sept. 16, 1996), *with* 30 *N.J.R.* 3727–29 (Oct. 19, 1998), *and N.J.A.C.* 7:7A–5.23. After the rejection of the first GP23 draft proposal, DEP responded by including a definition of the term "loss" and a "no net loss of wetlands" provision in both the second proposal, 30 *N.J.R.* 3721, 3727 (Oct. 19, 1998), and in the final adopted version. *N.J.A.C.* 7:7A–1.4, –5.23(g). On adoption, DEP explained that wetland losses,[7] such as the filling of wetlands "to create a berm around a bog[,] . . . must be compensated for to ensure no net

---

[6] GP23 only became effective following the conclusion of a memorandum of agreement between DEP, the Pinelands Commission, and the Pinelands Development Credit Bank. 32 *N.J.R.* 1253(a) (Apr. 3, 2000). Under the terms of the permit, that agreement was required to ensure the efficient administration of the Atlantic white-cedar restoration program. *See N.J.A.C.* 7:7A–5.23(n), (u).

[7] "Loss" is defined as, "an alteration of a wetland or water to the extent that the wetland or water, or portion thereof, no longer retains the functions and characteristics of a wetland or water." *N.J.A.C.* 7:7A–1.4. EPA considers that definition to be roughly comparable with the approach used by the Corps. Issuance of Nationwide Permits, 67 *Fed.Reg.* 2020, 2094 (Jan. 15, 2002).

loss." 31 *N.J.R.* 2965 (Oct. 4, 1999). Such losses are distinguished from mere disturbances that retain some of the "values and functions" of a natural wetland, 31 *N.J.R.* 1566 (June 21, 1999), and are "subject to [the] acreage caps and other limits, but not subject to the no net loss provision." 31 *N.J.R.* 2965 (Oct. 4, 1999).

DEP also included in the final permit additional measures intended to direct the impacts attributable to the expansion of cranberry growing operations away from high value wetlands, particularly wetlands dominated by the Atlantic White Cedar ("AWC"). 28 *N.J.R.* 4145–46, 4148–49 (Sept. 16, 1996). First, DEP created "a hierarchy of various wetland types," reflecting their relative ecological value. *Id.* at 4145, 4149; *see N.J.A.C.* 7:7A–5.23(d).[8] To secure DEP approval cranberry farmers are required to expand in the lowest value wetland available, preferably in an area that can be serviced by existing infrastructure and sources of water. *N.J.A.C.* 7:7A–5.23(c). Second, applicants expanding into higher value wetlands must contribute Pineland Development Credits at a fixed ratio based on the value of the wetland lost or disturbed. *Id.* at (*l*). The proceeds from the sale of those Pinelands Development Credits are used to fund DEP's AWC restoration program. *Id.* at (m), (n). Third, significant restrictions are placed on applicants seeking to expand into areas

---

[8] *N.J.A.C.* 7:7A–5.23(d) states:

For the purposes of [GP23], State open waters and wetland types are ranked in the order that they shall be considered for use for the expansion of a cranberry growing operation, as follows:

1. State open waters;
2. Abandoned blueberry fields;
3. Abandoned cranberry bogs;
4. Abandoned agricultural fields;
5. Freshwater wetlands dominated by emergent vegetation;
6. Freshwater wetlands dominated by scrub/scrub vegetation;
7. Forested freshwater wetlands that are not Atlantic white-cedar wetlands; and
8. Atlantic white-cedar wetlands.

[*N.J.A.C.* 7:7A–5.23(d).]

dominated by the AWC. *Id.* at (j). Before undertaking any expansion "result[ing] in the loss and/or disturbance of Atlantic white-cedar wetlands," an applicant must demonstrate that no "suitable upland area" (defined by certain hydrological and soil conditions), is available. *Ibid.*

Although earlier drafts of GP23 capped at 300 acres the amount of wetlands that could be disturbed during the five-year life of GP23, those versions did not set any limit for high-value forested wetlands. *See* 31 *N.J.R.* 1565 (Oct. 4, 1999). Under GP23 as adopted, only eighty acres of forested wetlands may be disturbed during the life of the general permit, *N.J.A.C.* 7:7A–5.23(i)3, and, of these eighty acres, only twenty-five may be AWC wetlands.[9] *Id.* at (i)4. In addition, individual operators may not disturb more than ten acres of forested wetlands, only four of which can be AWC wetlands. *Id.* at (h)2, (h)3. Indeed, the final permit requires that the loss or disturbance of AWC wetlands must be compensated at a one-to-one ratio. *Id.* at (n)2. The DEP Commissioner (Commissioner) must determine yearly whether "the pace of impacts under [GP23] is proportional to the pace of [AWC] restoration efforts." *Id.* at (q). If the pace of impacts exceeds the pace of restoration, DEP must temporarily "stop issuing authorizations under [the permit]." *Id.* at (q)2.

Finally, GP23 as adopted provides the Commissioner with broad discretionary power to "modify, suspend or revoke [permit] authorizations." *Id.* at (r). This power is akin to that of a Corps of Engineers Division or District Engineer under the federal 404 program and allows the Commissioner to consider project-specific concerns, such as expansion into ecologically sensitive areas. 31 *N.J.R.* 1563 (June 21, 1999); *see* 33 *C.F.R.* § 330.4(e). If the Commissioner determines that the proposed activity of an individual applicant would create "more than minimal individual or

---

9 Yearly caps, limiting the acreage disturbed per year to sixty, complement the 300–acre overall cap. *N.J.A.C.* 7:7A–5.23(i)1. DEP may permit carry-over of up to thirty acres that were not used in the prior year. *Ibid.*

cumulative adverse impacts on the environment," the GP23 authorization may be modified to alleviate those impacts, *N.J.A.C.* 7:7A–5.23(r), or the applicant may be compelled to seek an individual permit. *Ibid.*

Because DEP addressed EPA's concerns in the 1999 reproposal, the Regional Administrator withdrew the Agency's objections to GP23:

> EPA does not object to the issuance of GP 23, in accordance with the provisions of 40 CFR 233.50, and we have determined that GP23 will have *no more than minimal environmental effects* on the aquatic environment. *This action is taken in part because EPA has determined that NJDEP has modified GP 23 to include all the required modifications stated in our letter dated April 16, 1999.*
> [ (Emphasis added).]

## II.

### A.

### FWPA and the Pinelands

DEP argued below that the mitigation requirements of the FWPA are not applicable to GP23 because the statute does not apply in the pinelands. Before us, DEP contends that *N.J.S.A.* 13:9B–6b merely "limits the scope of regulated activities in the Pinelands Area to discharges of dredged or fill material into freshwater wetlands, and does not allow DEP to require freshwater wetland transition areas." Put another way, DEP now takes the position that the FWPA permitting program applies to the pinelands, at least in respect of the discharge of dredged or fill material. *See N.J.A.C.* 7:7A–2.9(b), (c).

*N.J.S.A.* 13:9B–6b states:

> Activities in areas under the jurisdiction of the Pinelands Commission pursuant to [the Pinelands Protection Act, *N.J.S.A.* 13:18A–1 to –29] shall not require a freshwater wetlands permit, or be subject to transition area requirements established in this act, *except that the discharge of dredged or fill material shall require a permit* issued under the provisions of the Federal Act, *or under an individual or general permit program administered by the State under the provisions of the Federal Act and applicable State laws,* provided that the Pinelands Commission may provide for more stringent regulation of activities in and around freshwater wetland areas within its jurisdiction.

[ (Emphasis added).]

On its face, *N.J.S.A.* 13:9B–6b expressly and clearly requires a permit for the discharge of dredged or fill material. (In fact, state assumption of the federal permitting program would not have been possible if DEP did not have "the power to regulate discharges of dredged or fill material into state-regulated waters." *In re Freshwater Wetlands Prot. Act Rules, N.J.A.C. 7:7A–1.1 et seq.,* 238 *N.J.Super.* 516, 520, 570 *A.2d* 435 (App.Div.1989); *see* 33 *U.S.C.A.* § 1344(h)(1)(A); 40 *C.F.R.* § 233.1(b).) It is also clear that, post-assumption, the permit required for that activity would be issued by DEP as the designated authority "under ... *applicable State laws.*" *N.J.S.A.* 13:9B–6b (emphasis added); *see* 31 *N.J.R.* 1570 (June 21, 1999) (stating that, post-assumption, "New Jersey's wetlands program has operated in place of the Federal wetlands program throughout the State"). That understanding of the plain meaning of the statute is consistent with DEP's earlier statements concerning its authority to enforce provisions of the FWPA in the pinelands. *See N.J.A.C.* 7:7A–2.9(b) (noting that "[t]he discharge of dredged or fill material in a freshwater wetland or State open water under the jurisdiction of the Pinelands Commission is subject to freshwater wetlands and open water fill permit requirements under this chapter"). In its response to comments on the adoption of GP23, DEP observed that *N.J.S.A.* 13:9B–6b "prohibits the Department from applying the requirements of the [FWPA] in the Pinelands, *with one exception:* the regulation of the discharge of dredged or fill material." 31 *N.J.R.* 2969 (Oct. 4, 1999) (emphasis added). Thus, DEP's prior reading of *N.J.S.A.* 13:9B–6b comports with its position before this Court.

We find that the DEP has the authority under the FWPA to issue both general and individual permits allowing the discharge of dredged or fill material into wetlands situated in the pinelands. We observe, further, that *N.J.S.A.* 13:9B–6b expressly bars DEP enforcement of FWPA transition area requirements in the pinelands and leaves to the Pinelands Commission that regulatory responsibility. *See N.J.S.A.* 13:18A–10c (stating that, "no State approval ... shall be granted, unless such approval or grant

conforms with the provisions of [the Pinelands C]omprehensive [M]anagement [P]lan"). Pursuant to that authority, the Commission "may provide for more stringent regulation in and around freshwater wetlands within its jurisdiction, which include transition area regulations." *N.J.A.C.* 7:7A–2.9(b); *see N.J.A.C.* 7:50–6.14 (prohibiting development in 300 foot transition area surrounding wetlands in areas under Pinelands Commission jurisdiction); *see generally N.J.A.C.* 7:50–6.1 *et seq.* (providing comprehensive wetland regulatory program in pinelands).

### B.

### Mitigation under the FWPA

■ Appellants argue, however, that *N.J.S.A.* 13:9B–13a mandates compulsory mitigation for all "adverse environmental impacts" attributable to activities requiring a general permit or an individual permit. In their view, neither one-to-one mitigation for all AWC impacts, nor the GP23 "no net loss" provision, provides sufficient mitigation under the statute. Conversely, DEP maintains that it may adopt General Permits "that do not require mitigation, except as necessary to ensure that a General Permit will not cause more than minimal impacts on a cumulative or individual basis." *See* 31 *N.J.R.* 2969 (Oct. 4, 1999). DEP points out that, nonetheless, it retains discretionary authority to impose mitigation requirements or other special conditions as part of an individual General Permit authorization when such requirements are necessary to insure compliance with the FWPA or the CWA. *See N.J.S.A.* 13:9B–23d; *N.J.A.C.* 7:7A–4.1(d); *N.J.A.C.* 7:7A–13.2(a).

■ As with any administrative regulation, we begin with the settled principle that GP23 must be "accorded a presumption of validity." *New Jersey State League of Municipalities v. Dep't of Cmty. Affairs,* 158 *N.J.* 211, 222, 729 *A.2d* 21 (1999); *In re Township of Warren,* 132 *N.J.* 1, 26, 622 *A.2d* 1257 (1993).

Appellants bear the heavy burden of demonstrating that the regulatory requirements found in GP23 are "arbitrary, capricious or unreasonable." *League of Municipalities, supra,* 158 *N.J.* at 222, 729 *A.*2d 21; *accord New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 561, 384 *A.*2d 795 (1978). Deference to DEP's interpretation is justified by "the 'fundamental maxim that the opinion as to the construction of a regulatory statute of the expert administrative agency charged with the enforcement of that statute is entitled to great weight.'" *In re Freshwater Wetlands Prot. Act Rules, supra,* 238 *N.J.Super.* at 527, 570 *A.*2d 435 (*quoting Long, supra,* 75 *N.J.* at 575, 384 *A.*2d 795). Accordingly, this Court has sustained executive branch rulemaking unless it was clear "that the agency action was inconsistent with the legislative mandate," *In re Township of Warren, supra,* 132 *N.J.* at 26, 622 *A.*2d 1257 (citation omitted), or the challenged regulation "alter[ed] the terms of a legislative enactment or frustrate[d] the policy embodied in the statute." *New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n,* 82 *N.J.* 57, 82, 411 *A.*2d 168 (1980); *In re Freshwater Wetlands Prot. Act Rules, supra,* 238 *N.J.Super.* at 526, 570 *A.*2d 435; *see also Long, supra,* 75 *N.J.* at 562, 384 *A.*2d 795 (stating that "the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities").

In this case, DEP interprets *N.J.A.C.* 7:7A–5.23(g) to require any loss of wetlands caused by activities authorized under GP23 to "be compensated for on a one-to-one ratio." *See N.J.A.C.* 7:7A–5.23(g); 31 *N.J.R.* 1566 (June 21, 1999). Appellants contend that the mitigation requirements of *N.J.S.A.* 13:9B–13 and its implementing regulations, *N.J.A.C.* 7:7A–15.1 *et seq.,* can be met only through the "creation or restoration of wetlands to compensate for any damage done pursuant to [GP23]" at a one-to-one ratio for all wetland impacts, including disturbances. Thus, the issue is joined over the mitigation requirements, if any, for disturbances to, as

opposed to loss of wetlands caused by activities permitted under GP23.

*N.J.S.A.* 13:9B–13 states in pertinent part:

a. The department shall require as a condition of a freshwater wetlands permit that all appropriate measures have been carried out to mitigate adverse environmental impacts, restore vegetation, habitats, and land and water features, prevent sedimentation and erosion, minimize the area of freshwater wetlands disturbance and insure compliance with the Federal Act and implementing regulations.

b. The department *may require* the creation or restoration of an area of freshwater wetlands of equal ecological value to those which will be lost, . . . .

[ (Emphasis added).]

Again, the statutory language is clear. Although Section 13(a) requires "all appropriate measures" by way of mitigation, restoration and minimization of "adverse environmental impacts" and "wetland disturbances," Section 13(b) is permissive and states only that the DEP "may require creation or restoration" of wetlands of equal value and, then, only when wetlands have been "lost" through a permitted activity. Moreover, a review of the legislative history supports DEP's assertion that the creation or restoration of wetlands to compensate for adverse impacts attributable to a permitted activity is by no means mandatory, but merely a weapon in DEP's larger mitigation arsenal. *See* Senate Energy and Environment Committee, *Statement to Senate Committee Substitute for Assembly Committee Substitute for Assembly Bills 2342 and 2499,* at 4 (June 25, 1987) (noting "[t]his bill *authorizes* the department to require the creation or restoration of wetlands to compensate for any wetlands destroyed as a result of a project in a freshwater wetland permitted by the department") (emphasis added).

Finally, we recognize that the FWPA covers more types of wetlands activities than does the CWA. *See MCG Assocs. v. Dep't of Envtl. Prot.,* 278 *N.J.Super.* 108, 112, 650 *A.2d* 797 (App.Div. 1994) (noting "DEP has the authority to regulate more activities" under FWPA than EPA and Corps have under CWA). That DEP has the power to control activities in New Jersey wetlands that are not covered under federal law does not, however, lead to a conclusion that more stringent mitigation requirements than those

found in GP23 are mandated when the express language of the statute states otherwise. We find, therefore, that the mitigation provisions of GP23 are consistent with the FWPA.

## III.

## A.

### GP23 and Nationwide Permit 34

■ Appellants also claim that GP23 is "impermissibly less stringent" than Nationwide Permit 34 ("NWP34"), the comparable federal permit for the expansion of cranberry growing operations. *In re FWPA, supra,* 351 *N.J.Super.* at 377–82, 798 *A.*2d 634. As explained earlier, *supra* at 428, 852 *A.*2d at 175, EPA has determined that New Jersey's "revised GP23 is consistent with and as stringent as the standards of the Federal wetlands program." In approving the final draft of GP23, EPA specifically stated that the "no net loss" provision and the AWC restoration requirement meet federal mitigation standards. The Appellate Division thoroughly addressed appellants' claim, affording EPA's interpretation appropriate deference. *Ibid.; see Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 *U.S.* 837, 842–46, 104 *S.Ct.* 2778, 2781–83, 81 *L.Ed.*2d 694, 702–04 (1984) (describing deferential standard of review accorded findings of federal administrative agency). The court below found that although the GP23 acreage restrictions are different from those found in NWP34, on balance, the state restrictions are as stringent, and, further, that the mitigation, protection for endangered species, and upland alternatives requirements of GP23 meet federal standards. We affirm the Appellate Division determinations on those issues substantially for the reasons expressed in Judge Petrella's well-reasoned opinion, *In re FWPA, supra,* 351 *N.J.Super.* at 377–82, 798 *A.*2d 634, adding only the following comments relating to one-to-one mitigation for all wetland disturbances.

## B.

### One–to–One Mitigation Under NWP34

■    NWP34 [10] allows for the limited expansion of existing cranberry operations provided the expansion project meets certain criteria:

a.   The cumulative total acreage of disturbance per cranberry production operation, including but not limited to, filling, flooding, ditching, or clearing, does not exceed 10 acres of waters of the U.S., including wetlands;

b.   The permittee notifies the District Engineer in accordance with the "Notification" General Condition.  The notification must include a delineation of affected special aquatic sites, including wetlands;  and,

c.   The activity does not result in a net loss of wetland acreage.

This NWP does not authorize any discharge of dredged or fill material related to other cranberry production activities such as warehouses, processing facilities, or parking areas.  For purposes of this NWP, the cumulative total of 10 acres will be measured over the period that this NWP is valid.

[Final Notice of Issuance, Reissuance, and Modification of Nationwide Permits, 61 Fed.Reg. 65874, 65919 (Dec. 13, 1996).]

Nationwide Permits are issued subject to twenty-six General Conditions, including General Condition 19, which details mitigation requirements for NWP34 authorizations.  Notice of Final Issuance and Modification of Nationwide Permits, 65 Fed.Reg. 12818, 12893–97 (Mar. 9, 2000).

Appellants apparently concede that GP23 complies with the federal mitigation requirements in place at the time GP23 was adopted.  They contend that subsequent changes to General Condition 19 render GP23 inconsistent with NWP34.  Ibid.  Under General Condition 19, "Mitigation" is described as follows:

19.   Mitigation. The project must be designed and constructed to avoid and minimize adverse effects to waters of the United States to the maximum extent

---

[10] The Corps originally adopted NWP34 in 1991.  Final Rule for Nationwide Permit Program Regulations and Issue, Reissue, and Modify Nationwide Permits, 56 Fed.Reg. 59110, 59144 (Nov. 22, 1991).  Although the General Conditions that apply to all Nationwide Permits have changed, the specific requirements of NWP34 have not.  Issuance of Nationwide Permits, 67 Fed.Reg. 2020, 2085 (Jan. 15, 2002); Final Notice of Issuance, Reissuance, and Modification of Nationwide Permits, 61 Fed.Reg. 65874, 65919 (Dec. 13, 1996).

practicable at the project site (*i.e.*, on-site). Mitigation will be required when necessary to ensure that the adverse effects to the aquatic environment are minimal. The District Engineer will consider the factors discussed below when determining the acceptability of appropriate and practicable mitigation necessary to offset adverse effects on the aquatic environment.

(a) Compensatory mitigation at a minimum 1:1 ratio will be required for all wetland impacts requiring a PCN.

[*Id.* at 12896.]

By its terms, sub-section (a) states that projects for which preconstruction notification ("PCN") must be obtained are required to have compensatory mitigation at a one-to-one ratio for all wetland impacts. PCN, in turn, applies to certain activities proposed in state-designated critical resource waters and wetlands adjacent to such waters. *Id.* at 12897. Appellants argue, therefore, that because pinelands waters are Outstanding Natural Resource Waters, *N.J.A.C.* 7:9B–1.15(i), the one-to-one mitigation requirement applies to NWP34. They conclude that NWP34 is more stringent than GP23, which, admittedly, does not require one-to-one mitigation for all wetland impacts. *In re FWPA, supra,* 351 *N.J.Super.* at 379, 798 *A.*2d 634.

■ General Condition 19 mandates compensatory mitigation when "necessary to ensure that the *adverse effects to the aquatic environment are minimal.*" Notice of Final Issuance and Modification of Nationwide Permits, 65 *Fed.Reg.* at 12896 (emphasis added). The corollary of that mandate is that if the project only causes minimal adverse effects, compensatory mitigation is not necessary. Indeed, on responding to comments to the draft General Conditions, the Corps stated that projects subject to the PCN requirement did not, by virtue of that designation, automatically become subject to the one-for-one mitigation requirement of subsection (a) of General Condition 19. Proposal to Issue and Modify Nationwide Permits, 64 *Fed.Reg.* 39252, 39343–44 (July 21, 1999). Even for projects requiring a PCN, the Corps considers that "[i]f no compensatory mitigation is necessary to reduce the adverse effects of the aquatic environment to the minimal level, then the District Engineer does not need to require compensatory mitigation." *Id.* at 39344.

When EPA dropped its objections to the final draft of GP23, the Agency informed DEP by letter that, "GP23 will have no more than minimal environmental effects on the aquatic environment." It follows, in respect of cranberry operations permitted under GP23, that one-to-one mitigation of *all* wetlands impacts is not necessary to bring the state program into conformity with the federal program, and that the mitigation requirements of GP23 are no less stringent than those required by General Condition 19.

## IV.

### A.

### Surface Water Quality Standards

The state surface water quality standards, *N.J.S.A.* 58:10A–4c, *N.J.A.C.* 7:9B–1.1 *et seq.*, are an important part of an integrated federal and state regulatory program adopted to fulfill the goals of the CWA. 33 *U.S.C.A.* § 1313; *PUD No. 1 of Jefferson County v. Wash. Dep't of Ecology,* 511 *U.S.* 700, 704–05, 114 *S.Ct.* 1900, 1905, 128 *L.Ed.*2d 716, 723 (1994); *see E.I. du Pont de Nemours & Co. v. Train,* 430 *U.S.* 112, 116–21, 97 *S.Ct.* 965, 969–72, 51 *L.Ed.*2d 204, 210–13 (1977) (describing broader statutory scheme enacted by Congress "to achieve the goal of eliminating all discharges of pollutants into the Nation's waters"). As the United States Supreme Court has observed, state-based water quality standards are one of two "water quality measures" required by the federal statute:

"Effluent limitations" are promulgated by the EPA and restrict the quantities, rates, and concentrations of specified substances which are discharged from point sources. See [33 *U.S.C.A.*] §§ 1311, 1314. "[W]ater quality standards" are, in general, promulgated by the States and establish the desired condition of a waterway. See [33 *U.S.C.A.*] § 1313. These standards supplement effluent limitations "so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels."

[*Arkansas v. Oklahoma,* 503 *U.S.* 91, 101, 112 *S.Ct.* 1046, 1054, 117 *L.Ed.*2d 239, 251–52 (1992) (quoting *EPA v. California ex rel. State Water Res. Control Bd.,* 426 *U.S.* 200, 205, n. 12, 96 *S.Ct.* 2022, 2025, n. 12, 48 *L.Ed.*2d 578, 583, n. 12 (1976)).]

Effluent limitations are regulated through the National Pollution Discharge Elimination Program (NPDES), which authorizes EPA to issue permits for individual point source discharges into the nation's waterways. 33 *U.S.C.A.* § 1342; *E.I. du Pont, supra,* 430 *U.S.* at 119, 97 *S.Ct.* at 970–71, 51 *L.Ed.*2d at 212. In essence, NPDES permits "transform generally applicable effluent limitations ... into ... obligations" imposed for specific discharges. *E.I. du Pont, supra,* 430 *U.S.* at 119–20, 97 *S.Ct.* at 970–71, 51 *L.Ed.*2d at 212 (quoting *State Water Res. Control Bd., supra,* 426 *U.S.* at 205, 96 *S.Ct.* at 2025, 48 *L.Ed.*2d at 583–84). DEP assumed authority to administer the NPDES program in New Jersey in 1982 pursuant to the New Jersey Water Pollution Control Act, *N.J.S.A.* 58:10A–1 to –43. *In re Issuance of a Permit by the Dep't of Envtl. Prot. to Ciba–Geigy Corp.,* 120 *N.J.* 164, 169, 576 *A.*2d 784 (1990). The state statute "prohibits the discharge of pollutants [from point sources] into any state waters without a New Jersey Pollution Discharge Elimination System (NJPDES) permit." *Ibid.* (citing *N.J.S.A.* 58:10A–6a).

In 1987, the CWA was amended to require the SWQS to include an "antidegradation policy," 33 *U.S.C.A.* § 1313(d)(4)(B); 40 *C.F.R.* § 131.12(a), to "ensure that '[e]xisting instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and preserved.'" *Jefferson County, supra,* 511 *U.S.* at 705, 114 *S.Ct.* at 1905–06, 128 *L.Ed.*2d at 723–24 (quoting 40 *C.F.R.* § 131.12(a)(1) (1993)); *Ciba–Geigy, supra,* 120 *N.J.* at 176–77, 576 *A.*2d 784. Like FWPA permits (which must be as stringent as their federal analog), the State antidegradation policy must be at least as stringent as the federal program, 40 *C.F.R.* §§ 131.6(d), 131.12, and is subject to EPA approval. 33 *U.S.C.A.* § 1313(c)(3); 40 *C.F.R.* § 131.5. In *Ciba–Geigy, supra,* we explained that under the state policy, *N.J.A.C.* 7:9B–1.5(d), "[n]o irreversible changes may be made to existing water quality that would impair or preclude attainment of the designated uses of a waterway." 120 *N.J.* at 177, 576 *A.*2d 784.

To effectuate that mandate, New Jersey has established four categories of state waters that receive differing levels of protection from discharges affecting existing water quality. *N.J.A.C.* 7:9B–1.5(d); *Ciba–Geigy, supra,* 120 *N.J.* at 177–78, 576 *A.2d* 784. The waters of the pinelands are designated either FW1 or PL, *N.J.A.C.* 7:9B–1.4, and classified as "Outstanding National Resource Waters of the State." *N.J.A.C.* 7:9B–1.15(i). Those waters are considered "nondegradation waters," *N.J.A.C.* 7:9B–1.5(d)(4), and are afforded the highest level of protection from changes in existing water quality. 40 *C.F.R.* § 131.12(a)(3); *N.J.A.C.* 7:9B–1.5(d). Under the state antidegradation policy, *"[n]o changes* shall be allowed in waters which constitute an outstanding National or State resource or in waters that may affect these outstanding resource waters." *N.J.A.C.* 7:9B–1.5(d)4 (emphasis added); *see* 40 *C.F.R.* § 131.12(a)(3) ("Where high quality waters constitute an outstanding National resource, such as the waters of National and State parks and wildlife refuges and waters of exceptional recreational or ecological significance, that water quality shall be maintained and protected."). Similarly, "[f]or Pinelands waters, the Department shall not approve any activity which alone or in combination with any other activities, might cause changes, other than toward natural water quality, in the existing surface water quality characteristics." *N.J.A.C.* 7:9B–1.5(d)(6).

## B.

### GP23 and the Antidegradation Policy

Appellants' remaining claim is that DEP adopted GP23 without consideration of the state's antidegradation policy thereby violating the SWQS. In their view, that failure renders GP23 invalid. They acknowledge that the SWQS contain a provision that states: "The [antidegradation] policy is not intended to interfere with water control in the operation of cranberry bogs or blueberry production," *N.J.A.C.* 7:9B–1.5(d)(6)(ii)(1), but contend that that provision was meant to exempt review of water flows, *i.e.,* quantity, and not the chemical content of the water. *Cf. Jefferson*

*County supra*, 511 *U.S.* at 718–20, 114 *S.Ct.* at 1912–13, 128 *L.Ed.*2d at 732–33 (1994) (holding State of Washington could condition required CWA project certification on quantity of water removed).

The question before the Court, then, is whether the exemption provided in *N.J.A.C.* 7:9B–1.5(d)(6)(ii)(1) shields GP23 from antidegradation review. The Appellate Division accepted DEP's interpretation that the rule is applicable both to the quality and the quantity of water used in cranberry growing operations. *In re FWPA, supra*, 351 *N.J.Super.* at 383, 798 *A.*2d 634. Reduced to its simplest form, the question whether antidegradation review is required involves dueling interpretations of arguably ambiguous regulatory language.

Appellants rely on the United States Supreme Court decision in *Jefferson County, supra*, to support their argument that *N.J.A.C.* 7:9B–1.5(d)(6)(ii)(1) "only deals with the flow and volume of water." In *Jefferson County*, the Supreme Court considered whether the Washington Department of Ecology could condition the grant of a CWA § 401 water quality certification on a minimum stream flow requirement.[11] 511 *U.S.* at 708–10, 114 *S.Ct.* at 1907–08, 128 *L.Ed.*2d at 726–27. Washington justified the requirement, in part, as "necessary to implement the 'antidegradation policy' of § 303 [of the CWA], 33 *U.S.C.* § 1313(d)(4)(B)." *Id.* at 718, 114 *S.Ct.* at 1912, 128 *L.Ed.*2d at 731. The Court rejected the claim that the CWA "is only concerned with water 'quality,' and does not allow the regulation of water 'quantity'." *Id.* at 719, 114 *S.Ct.* at 1912–13, 128 *L.Ed.*2d at 732. In upholding the condition, the Court determined that states "*may* include minimum stream flow requirements" in a § 401 water quality certification "insofar as

11 Applicants for a federal license or permit for an activity which "may result in any discharge into ... navigable waters" must secure a water quality certification from the state "in which the discharge originates or will originate." 33 *U.S.C.A.* § 1341(a). Permits issued by DEP under the authority of the FWPA, including GP23, "constitute the water quality certificate required under the [CWA] at 33 *U.S.C.* § 1341." *N.J.A.C.* 7:7A–2.1(d).

necessary to enforce a designated use contained in a state water quality standard." *Id.* at 723, 114 *S.Ct.* at 1914, 128 *L.Ed.*2d at 735 (emphasis added).

It is a substantial jump from a holding that water flows may be regulated by the states under their antidegradation policies to the claim that the exemption for water control in cranberry and blueberry production found in *N.J.A.C.* 7:9B–1.5(d)(6)(ii)(1) applies *only* to water flows and *not* water quality.[12] (One might ask why blueberries that are not grown in bogs would be included in an exemption that only dealt with water flows.) Moreover, an examination of the Water Pollution Control Act and its implementing regulations reveals that agricultural uses are shielded by statute and by rule from many of the requirements of the Act. As pointed out by the Appellate Division, *N.J.S.A.* 58:10A–6(d)(8) specifically provides DEP with the authority to exempt from NJPDES permitting requirements "[d]ischarges resulting from agriculture, including aquaculture, activities." *In re FWPA, supra,* 351 *N.J.Super.* at 383, 798 *A.*2d 634. In line with that grant of statutory authority, DEP has broadly exempted from those requirements "[a]ny introduction of pollutants from nonpoint source agricultural and silvicultural activities, including runoff from orchards, cultivated crops, pastures, range lands, and forest lands" and "[r]eturn flows from irrigated agriculture." *N.J.A.C.* 7:14A–2.5(a)(4), (5).

Most important, "[c]ranberry bog water supply and other agricultural uses" are included among the designated uses of PL, or pinelands waters. *N.J.A.C.* 7:9B–1.12(b). A broad reading of the exemption is consistent therefore with the goals of the SWQS—to

---

[12] We observe, simply because it puts appellants' claim in context, that activities authorized by GP23 have been determined by EPA, in a letter to the United States Fish and Wildlife Service, not to affect water quality in the pinelands. *See Arkansas v. Oklahoma, supra,* 503 *U.S.* at 110–111, 112 *S.Ct.* at 1059, 117 *L.Ed.*2d at 258 (affirming administrative law judge determination that Oklahoma's antidegradation policy would be violated only if a proposed discharge "effected an 'actually detectable or measurable' change in water quality").

maintain and protect the existing uses of the waters of this State. *N.J.A.C.* 7:9B–1.5(d)(2); *see N.J.A.C.* 7:9B–1.5(a)(2) ("It is the policy of the State ... to enhance the domestic, municipal, recreational, industrial, agricultural and other reasonable uses of the State's waters."). Given the favored status accorded both agriculture generally (by the Water Pollution Control Act) and cranberry agriculture in particular (by the Pinelands Protection Act), DEP's broad interpretation of the *N.J.A.C.* 7:9B–1.5(d)(6)(ii)(1) exemption is reasonable. *See Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 327, 478 *A.*2d 742 (1984) (stating "agency's interpretation of the operative law is entitled to prevail, so long as it is not plainly unreasonable").

We find that the state antidegradation policy has not been violated by the adoption of GP23.

## V.

The judgment of the Appellate Division is affirmed.

Justice ZAZZALI, concurring.

I join the Court's opinion in full, including Part IV.B., which addresses the New Jersey Department of Environmental Protection's (DEP) interpretation of *N.J.A.C.* 7:9B–1.5(d)(6)(ii)(1) exempting General Permit 23 (GP23) from antidegradation review. I agree with the Court's legal conclusion on that issue, but write separately to underscore my reasoning and my concern.

Appellants challenge DEP's construction of *N.J.A.C.* 7:9B–1.5(d)(6)(ii)(1), a regulation that DEP promulgated. When reviewing an agency's interpretation of its own regulation, we must give substantial deference to the agency unless its interpretation is inconsistent with the governing legislation. *DiMaria v. Bd. of Trs. of Pub. Employees' Ret. Sys.,* 225 *N.J.Super.* 341, 351, 542 *A.*2d 498 (App.Div.), *certif. denied,* 113 *N.J.* 638, 552 *A.*2d 164 (1988). For the reasons expressed by the Court, I agree that DEP's construction of *N.J.S.A.* 7:9B–1.5(d)(6)(ii)(1) is reasonable

and that we therefore must afford it substantial deference. *Ante* at 440, 852 *A.*2d at 182.

Nonetheless, I am persuaded that appellants' interpretation of *N.J.A.C.* 7:9B–1.5(d)(6)(ii)(1) better serves the express intent of New Jersey's antidegradation policy to give pinelands waters the highest level of protection from changes in water quality. As noted by the Court, pinelands waters are classified as "Outstanding National Resource Waters of the State," *N.J.A.C.* 7:9B–1.15(i), and under our antidegradation policy, *"[n]o changes* shall be allowed" in such waters, *N.J.A.C.* 7:9B–1.5(d)(4) (emphasis added). The policy further provides that with respect to waters in the pinelands, DEP "shall not approve any activity which alone or in combination with any other activities, might cause changes, other than toward natural water quality, in the existing water quality characteristics." *N.J.A.C.* 7:9B–1.5(d)(6)(ii).

As the Court explains, appellants argue that the exemption for water control found in *N.J.A.C.* 7:9B–1.5(d)(6)(ii)(1) does not relieve DEP of its obligation to subject GP23 to antidegradation review. "Water control," as they construe the term, encompasses the flow and volume of water and not its content. They, therefore, contend that GP23 applicants must comply with the stringent water quality standards applicable to pinelands waters as long as compliance does not interfere with the management of the quantity of water and the direction of its flow essential to cranberry bog operations. Conversely, under DEP's reading of the exemption for water control, the agency can issue GP23 authorization and allow the expansion of cranberry bogs without having to assess the impact of that expansion on the quality of pinelands waters. Because appellants' interpretation requires DEP to monitor the effects of GP23 on water quality, thereby ensuring that the waters in the pinelands are protected from change, I believe it is more consistent with the goals of our antidegradation policy.

Notwithstanding my preference for appellants' reading of the regulation, I recognize that "[o]ur task is not to decide which among several competing interpretations best serves the regulato-

ry purpose." *Thomas Jefferson Univ. v. Shalala,* 512 *U.S.* 504, 512, 114 *S.Ct.* 2381, 2386, 129 *L.Ed.*2d 405, 415 (1994). I therefore reluctantly concur in the Court's opinion. If DEP has erred, as I believe it has, it is the Legislature that must take corrective action.

*For affirmance*—Chief Justice PORITZ and Justices VERNIERO, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*Opposed*—None.